UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - x
In re:                          :
                                :   Chapter 7
DIRECT ACCESS PARTNERS,         :   Case No.
LLC,                            :   15-11259 (MEW)
                                :
         Debtor.                :
- - - - - - - - - x
YANN GERON, Chapter 7           :
Trustee of DIRECT               :   Adv. Pro. No.
ACCESS PARTNERS, LLC,           :   16-01058 (MEW)
                                :
         Plaintiff,             :
                                :
v.                              :
                                :
JAMES CRAIG, JOSEPH E.          :
FLORES DE MENESES, and          :
GERARD M. VISCI,                :
                                :
         Defendants.            :
- - - - - - - - - x

                 111 Broadway
                 New York, New York

                 December 13, 2016
                 10:05 a.m.


     EXAMINATION BEFORE TRIAL of BRIAN RYNIKER,

the Non-Party Witness, by The Respective

Parties, in the above-entitled action, held at

the above time and place, pursuant to

Subpoena, and to the Federal Rules of Civil

Procedure, taken before MARCI GLOTZER, a

shorthand reporter and Notary Public within

and for the State of New York.

67

1                          B. RYNIKER

2    **$25 million amount, and prescribes that**

3    **60 percent, which totals $15,055,284.40**

4    **belongs to the GMG participation, and the**

5    **40 percent, which is $10,036,856.26, belongs**

6    **to the corporate participation.**

7        Q.   Again, coming back to my question

8    with respect to disbursements made in 2009 as

9    described on Exhibit 1, the K2 analysis, of

10   the monies that you've described, just to

11   crystalize the point, how were they able to

12   fund the disbursements?

13       **A.   The additional cash flow that was**

14   **generated by the Miami group for that year**

15   **yielded 10 million.   Part of those funds were**

16   **used to cover corporate expenses.**

17       Q.   Would those corporate expenses

18   include these disbursements to the employees?

19       **A.   Certainly.**

20            MR. RYAN:   Are the highlights

21       part of the original document?

22            MR. JANEY:   They are the

23       original document.

24       Q.   Looking at page 11 of Exhibit 1 --

25   withdrawn.

1                          B. RYNIKER

2      Mr. De Meneses, how much money is described

3      as allocated or disbursed to him?

4           A.    $998,432.

5           Q.    In viewing row 32, where Mr. Craig

6      is identified, what disbursement is

7      identified in connection with him?

8           A.    $1,113,056.

9           Q.    Turning to page 17, viewing row 43,

10     where Mr. Visci is identified, how much

11     disbursement is identified in connection with

12     him?

13          A.    $530,798.

14          Q.    Based on the analysis that you

15     undertook from a financial analysis point of

16     view, what made the disbursements to these

17     employees possible in 2010?

18          A.    **The continued transactions that took**

19     **place with the Miami group.**

20               MR. JANEY:    Marking as

21          Exhibit 3 a two-page spreadsheet

22          identified as DAPYG015738.

23               (Whereupon, a document was marked

24          as Exhibit 3, for identification, as of

25          this date.)

1                        **B. RYNIKER**

2      **expenditures and/or unknown losses.**

3            Q.   What information does the net

4      capital amount in the context of the FOCUS

5      report provide?

6            **A.   It's a modified or an adjusted**

7      **equity value.**

8            Q.   When you prepared this spreadsheet,

9      then, FOCUS reports with, as it's labeled

10     here, adjustments, is it fair to say that you

11     prepared this report because there was a view

12     that the existing FOCUS reports were

13     incorrect?

14           **A.   Certainly as we started to find that**

15     **they were missing liability, we understand**

16     **that the aggregated indebtedness would be**

17     **wrong.**

18           Q.   Based on our earlier discussion in

19     your testimony, is it fair to say that the

20     principal line items that were missing from

21     the FOCUS reports were expenses and

22     liabilities related to the Miami team?

23           **A.   Yes.**

24           Q.   This analysis here is an attempt to

25     reconstitute expenses and liabilities to

1                    B. RYNIKER

2     recalculate the net capital position of what

3     it would have been on the FOCUS reports; is

4     that correct?

5          **A.   Yeah.   We believe our analysis -- in**

6     **our analysis of the general ledger and what**

7     **was believed to be the expenses of the Miami**

8     **group, that there was missing liabilities and**

9     **the expense related to those.  So we wanted**

10    **to bring them on to the monthly FOCUS report**

11    **to show the reduction in the capital**

12    **available.**

13         Q.   Viewing line eight -- I'm on page 1

14    of the exhibit -- it's identified as "net

15    capital before haircuts on securities

16    positions."  Do you see that there?

17         **A.   Yes.**

18         Q.   What are those numbers in line

19    eight?  What are those numbers?

20         **A.   Those are directly taken from the**

21    **FOCUS reports as filed by Direct Access**

22    **Partners.**

23         Q.   Viewing those numbers and taking

24    them for what they are -- as an example, on

25    12/31/2009, what would have been the net

1                    B. RYNIKER

2   capital position reported on the DAP FOCUS

3   reports?

4        A.   The DAP FOCUS report for 12/31/09

5   noted a $13,737,688 net capital before

6   haircuts.

7        Q.   Your testimony was that the middle

8   section here, CBIZ additional adjustments, is

9   to reconstitute the actual liabilities and

10  expenses of the firm; is that fair to say?

11       A.   Yes.

12       Q.   Viewing, then, say October, 2009,

13  what was on the DAP FOCUS report in net

14  capital?

15       A.   Net capital before haircuts for

16  October 31, 2009, was $17,415,435.

17       Q.   When I come down to row ten, that's

18  also labeled net capital; correct?

19       A.   Yes.

20       Q.   That number is actually a negative

21  number; correct?

22       A.   Yes.

23       Q.   Why is that number negative?   What

24  is that number?

25       A.   Row eight was actually net capital

1                    B. RYNIKER

2    before haircuts on security positions, where

3    row ten is subsequent to those security

4    positions, which is now just straight net

5    capital.

6         Q.   Just so that I understand, the 17.4

7    million number in October of '09 which is off

8    of the DAP FOCUS report shows substantial

9    positive net capital; correct?

10        A.   Yes.

11        Q.   How does that net capital become

12   negative?

13             MR. MCCABE:   Just so I'm

14        following, the negative being

15        negative 673,546?

16             MR. JANEY:   That's my question.

17        I'm just trying to understand.   There

18        are a lot of numbers here.

19        A.   There are two general adjustments

20   that take place.   There's the adjustment to

21   net capital before haircuts, which relates to

22   liabilities that are not on the books, and

23   therefore expenses that are not on the books.

24   There's a secondary adjustment related to --

25   there's just one adjustment at that point in

1                          B. RYNIKER

2      time which relates to the liabilities.

3           Q.   What liabilities?

4           A.   They were specifically, as of

5      10/31/09, $1,010,660 not recorded on the

6      books and records related to the house

7      reserve 2009 ETC.   There's $3,419,823 not

8      recorded related to the house reserve 2009/10

9      for Hurtado.   There's $10,305,198 due the GMG

10     participation, which is their 60 percent.   So

11     there were three major items.

12               There is a direct -- there is a

13     slight offset to these liabilities that

14     weren't recorded.   Based on our analysis we

15     determined that payout and allocation the ETC

16     was overly accrued by $6,000.   There was a

17     slight offset.

18          Q.   Just to be sure I understand, the

19     liabilities that made in actuality the net

20     capital figure to be negative are reflected

21     and carried on the James Craig spreadsheets,

22     but not reflected on the books of the

23     company?

24          A.   Correct.

25          Q.   Going back to the K2 analysis, which

86

1                           B. RYNIKER

2       is marked as Exhibit 1, and going to page 10

3       of that exhibit, based on your analysis and

4       viewing these distributions, what was, in

5       reality, the financial condition of DAP,

6       based on your analysis, going into October of

7       2009?

8            **A.    Well, at the end of 2009 --**

9            Q.    I'm sorry.   In October of 2009.

10           **A.    October 31, 2009, they had a**

11      **negative net capital.   And if they -- they**

12      **didn't have available capital to cover the**

13      **reserve necessary by FINRA at that point in**

14      **time.**

15           Q.    When I look at your analysis for

16      November and December, the net capital

17      position, even on an adjusted basis with your

18      adjustments, becomes positive again.   Do you

19      see that there?

20           **A.    Yes.**

21           Q.    Is that correct?

22           **A.    That's is correct.   In October,**

23      **2009, you have a negative net capital.**

24      **November and December, the net capital**

25      **increases and is positive as the month ends**

1                              B. RYNIKER

2      there.

3           Q.   What is making it positive in

4      November and December of '09?

5           A.   Based on the FOCUS reports, it was

6      the other deductions, which is basically line

7      items that were adding capital pursuant to

8      the formula for the FOCUS report.

9           Q.   Do you recall what those line items

10     were that were making it positive?

11          A.   I don't recall.   If I had the FOCUS

12     report, I might be able to.

13          Q.   For what year?

14          A.   For those two periods, I might be

15     able to.

16          Q.   Turning to page 3 of your analysis,

17     which is marked as Exhibit 4.   This page

18     describes activity in 2010; correct?

19          A.   Yes.

20          Q.   Based on your analysis in 2010, what

21     is happening financially and from a net

22     capital perspective with the company?

23          A.   Generally speaking, all of 2010 has

24     an adjusted net capital that is negative.

25          Q.   When does the net capital become



90

```
 1                      B. RYNIKER

 2   company have been able to make the $7 million

 3   withdrawal in January, 2010, if the

 4   liabilities from the James Craig report had

 5   been put on the books?

 6        A.   No.

 7        Q.   Why not?

 8        A.   Our analysis lays out that there are

 9   amounts not noted on the books and records

10   due GMG related to their 60/40 participation.

11   Further, the books and records did not

12   properly -- and let me go back.  The FOCUS

13   report did not properly account for the

14   discretionary bonus that was noted to Hurtado

15   of roughly 3.4 million.  When you make those

16   adjustments, the adjusted net capital before

17   haircuts was roughly 1.5 million.  And

18   further down, once you take the haircuts in,

19   it had a negative net capital of roughly 4.1

20   million.

21        Q.   An actual net capital in excess of

22   $4 million?

23        A.   Yes.

24        Q.   Drawing your attention to page 2 of

25   the exhibit, that particular resolution is
```

1                          B. RYNIKER

2                  MR. JANEY:  This exhibit, on

3          page 5.

4                  MR. RYAN:  Page 5, Exhibit 4?

5                  MR. JANEY:  Yes.

6                  MR. RYAN:  Which is the amount

7          are you referring to?

8                  MR. JANEY:  Exhibit 1 row 31,

9          Joseph De Meneses is paid 2 million.

10                 MR. RYAN:  Okay.

11         **A.   I cannot.   I need to see the**

12    **underlying work.**

13         Q.   On page --

14         **A.   Slow down.   What you are looking at**

15    **is a summary.   Let me go back.   I can't.   I**

16    **need to see the details behind the K2**

17    **analysis.**

18         Q.   Looking at page 7 of your analysis,

19    Exhibit 4, what's happening, based on your

20    analysis, financially here in 2012?

21         **A.   It's very similar to what's in 2011.**

22    **Our analysis shows there is negative capital**

23    **for the entire period, the month ending for**

24    **January 31, '12, through 12/31/12.**

25         Q.   Viewing your analysis at least from

125

```
 1                      B. RYNIKER

 2   January, 2010, through December of 2012, is

 3   it fair to say that for every single month,

 4   the broker dealer is in a negative income

 5   position?

 6        A.   Yes.

 7             MR. JANEY:   Those are my

 8        questions.

 9             (Time noted: 1:56 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```