UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | |
| | : | **Chapter 7** |
| **DIRECT ACCESS PARTNERS, LLC,** | : | |
| | : | **Case No. 15-11259 (MEW)** |
| Debtor. | : | |

------------------------------------------------------------x

| | | |
|---|---|---|
| **YANN GERON, CHAPTER 7 TRUSTEE,** | : | |
| **DIRECT ACCESS PARTNERS, LLC,** | : | |
| | : | |
| Plaintiff, | : | **Adv. Proc. No. 16-01058 (MEW)** |
| | : | |
| -against- | : | |
| | : | |
| **JAMES CRAIG, JOSEPH E. FLORES DE** | : | |
| **MENESES, and GERARD M. VISCI,** | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------x

## MEMORANDUM OPINION AFTER TRIAL

A P P E A R A N C E S :

GOTTLIEB & JANEY LLP
New York, NY
*Counsel for the Chapter 7 Trustee*
  By:  Derrelle M. Janey
        Sarah A. Adam

FOX ROTHSCHILD LLP
New York, NY
*Counsel for the Chapter 7 Trustee*
  By:   Kathleen M. Aiello

MCCABE & FLYNN, LLP
New York, NY 10004
*Counsel for James Craig*
  By:  Thomas J. McCabe

Joseph E. Flores De Meneses
  *Pro Se*

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

The chapter 7 trustee of Direct Access Partners, LLC ("DA Partners") seeks to recover more than five million dollars of payments received by defendants James Craig and Joseph De Meneses between 2009 and 2013. The Trustee contends that the payments were received directly or indirectly from DA Partners; that DA Partners transferred funds with an actual intent to hinder, delay or defraud its creditors; and that DA Partners transferred funds at a time when it intended to incur, or believed that it would incur, debts that it would not be able to pay as they matured. The Trustee also contends that DA Partners' transfers were constructively fraudulent in light of DA Partners' financial condition. The Trustee asserts claims under sections 273 through 276 of the New York Debtor and Creditor Law, made applicable by section 544(b) of the Bankruptcy Code, and also (with respect to a few transfers) under section 548(a) of the Bankruptcy Code. *See* 11 U.S.C. §§ 544(b), 548(a), 550; N.Y. D.C.L. §§ 273-276. Defendants have denied liability, and Craig has asserted a counterclaim seeking indemnification for his legal expenses.

For reasons set forth below judgment will be entered in favor of Craig and De Meneses on all of the Trustee's claims. Craig's counterclaim is denied.

### Jurisdiction and Power to Issue a Final Decision

The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(b)(2)(H) and 1334(b) and under 11 U.S.C. §§ 544(b), 548 and 550. The parties do not dispute that the Court has subject matter jurisdiction and personal jurisdiction and that the Court has power to render a final decision. The Trustee and Craig have also explicitly consented to a final determination of claims by this Court to the extent that such consent is needed. *See* 28 U.S.C. § 157; *Stern v. Marshall*, 564 U.S. 462 (2011); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. __, 135 S.Ct. 1932 (2015).

### Procedural History

DA Partners is a former broker-dealer.  A holding company, Direct Access Group, LLC ("DA Group"), owns 99% of the limited liability company membership interests in DA Partners.

DA Group was the subject of a contested involuntary chapter 7 bankruptcy petition dated May 30, 2013, and then filed a voluntary chapter 11 petition on July 22, 2013.  More than two years later (on August 18, 2015) the DA Group bankruptcy case was converted to a chapter 7 case.  Meanwhile, on May 14, 2015, DA Partners filed its own voluntary petition under chapter 7 of the Bankruptcy Code.  Yann Geron (the "Trustee") is the chapter 7 trustee in both cases.

On April 26, 2016, the Trustee filed this adversary proceeding on behalf of DA Partners against Craig, De Meneses and another individual named Gerald Visci.  The Trustee alleged that the defendants had received the proceeds of transfers that were fraudulent under the Bankruptcy Code and under the New York Debtor and Creditor Law.  No claims were filed (or could have been filed) on behalf of DA Group, because DA Group's two-year deadline for the filing of fraudulent transfer claims had expired on July 22, 2015, before DA Group's case was converted to a chapter 7 case and before the appointment of the Trustee in that case.  *See* 11 U.S.C. § 546(a).  The Trustee's claims against Visci were later dropped.  Craig and De Meneses filed Answers denying liability, and Craig filed a counterclaim seeking indemnification for certain legal fees.

In 2017, the Trustee moved to dismiss Craig's indemnification counterclaim.  (ECF Nos. 23, 24, 25.)  The Trustee noted that indemnification was not available if Craig committed acts "in bad faith" or through "active and deliberate dishonesty," and argued that the Trustee (on behalf of DA Partners) had the right to deny indemnification on this ground without the need for a court ruling.  However, the indemnification provision did not give the company (or the Trustee) the right to decide these issues, and the Court denied the motion.  (ECF No. 31.)

3

The Trustee also made a pre-trial motion to bar De Meneses from asserting certain defenses to the Trustee's claims. (ECF No. 54.) The Trustee argued that a guilty plea that De Meneses had entered, and an associated forfeiture judgment, precluded De Meneses from asserting "value" and "good faith" defenses to the Trustee's fraudulent transfer claims. The Court denied this motion. (ECF Nos. 64 and 65.) The Court noted that the guilty plea included admissions that De Meneses had participated in a criminal bribery scheme, but that it contained no statements or admissions as to DA Partners' alleged intent to hinder, delay or defraud creditors, or as to DA Partners' financial condition at the time it made transfers, or as to De Meneses' alleged knowledge of such an intent or financial condition. The Court also noted that the record that was before the Court at that time did not include any evidence as to how the amount of the forfeiture judgment against De Meneses had been determined. The Court held that the Trustee was free to introduce evidence at trial as to how the forfeiture judgment had been calculated and how (if at all) it overlapped with the Trustee's claims, but at trial the Trustee elected not to do so. Instead, the Trustee's counsel acknowledged at closing argument that the Trustee had chosen not to pursue his prior contentions regarding the alleged collateral estoppel and res judicata effects of the forfeiture judgment.

Curiously, though, issues relating to the forfeiture judgment resurfaced in a different form at trial. De Meneses argued that the forfeiture judgment did cover the same payments that the Trustee sought to recover, and that the Trustee should be barred from seeking any recovery on behalf of DA Partners except through the forfeiture proceedings in the criminal case. Those contentions are discussed below.

As directed by the Court, the Trustee and Craig prepared a pretrial order, which included certain stipulated facts. *See* ECF No. 60 at pages 6-21. De Meneses, who has throughout this litigation appeared *pro se*, did not participate in the preparation of the pretrial order. However,

4

during the trial he agreed to the accuracy of many of the relevant stipulated facts. As to De Meneses, the findings of fact set forth herein are not based on the stipulations except to the extent that they were confirmed by De Meneses or shown to be true by other competent evidence.

Five witnesses testified at trial. Brian Ryniker is a forensic accountant who testified about DA Partners' accounting for certain liabilities and about errors that he believed were made in the "net capital" calculations that DA Partners prepared. Bernard W. Costich is an expert witness who testified that in his opinion DA Partners was insolvent as of no later than May 31, 2009. Jonathan Ungar is a representative of Headwaters Holdings, one of DA Group's principal investors, who testified about loans and investments that Headwaters had made and about conversations he had with Craig and others about those loans and investments. De Meneses and Craig testified as well, and the Trustee also submitted excerpts from pretrial depositions of Craig.

During the trial, the Court admitted more than sixty exhibits in evidence. One proposed exhibit was excluded. At the end of trial Craig sought to introduce into evidence an expert witness report that the Trustee had filed in a New Jersey state court litigation against a former auditor of DA Partners. Craig's counsel admitted that he had obtained a copy of this report some time prior to the trial in this Court, but that he did not list it as an exhibit in the pretrial order, did not include it among the supplemental exhibits that the parties designated during the trial, and did not otherwise alert the Trustee's counsel of his plan to offer the report in evidence. The lack of notice prejudiced the Trustee by denying the Trustee the opportunity to have a witness present who could respond to contentions about what the report purportedly showed. The Court sustained the Trustee's objection and excluded the report on the ground that it had not been timely designated as an exhibit in accordance with the Court's pretrial procedures and the Joint Pretrial Order.

There were some unusual features of the exhibits, and also some unusual circumstances surrounding the conduct of the trial itself.

First, some of the exhibits were copies of complaints filed in criminal and civil proceedings that post-dated the transfers that are at issue, including a complaint filed by the Securities and Exchange Commission. The Stipulations between Craig and the Trustee also included statements about "allegations" made by the SEC and by the United States Attorneys' Office. Craig stipulated to the truth of certain accusations that had been made in criminal cases. In other instances, however, Craig merely stipulated that allegations were made, and did not stipulate that the allegations were correct. Nevertheless, the allegations were admitted into evidence by agreement between Craig and the Trustee and without objection by De Meneses, with no limiting caveats as to how that evidence could be used or considered by the Court. As to De Meneses, the Court finds that allegations may be taken as true if they were admitted in his guilty plea or if they are reflected in the judgments entered against him, or if De Meneses otherwise admitted their truth. As to Craig, allegations may be taken as true if Craig agreed to them in the Joint Pretrial Order or through other admissions. Otherwise, however, the Court finds that the mere fact that the SEC and the U.S. Attorneys' office made allegations is not persuasive evidence and is not sufficient, without admissions or other competent evidence, to prove the truth of those allegations.

Second, as noted above De Meneses chose not to participate in pretrial conferences. He was also absent when the trial began, only to appear during the opening statement by the Trustee's counsel. De Meneses participated in the rest of the first day of trial, but on the morning of the second day he called the Court and the Trustee's counsel to say that, due to family matters, he would be absent for the second day of the trial, though he did not want the trial to be held in abeyance. He was therefore not present for most of the testimony by Bernard Costich (the

6

Trustee's expert witness) and for the testimony by Mr. Ungar. Despite these two absences, De Meneses was otherwise present during the multi-day trial, and he put on a defense. In addition, the Court ordered the Trustee's counsel to provide De Meneses with a transcript of the testimony by Mr. Costich, and ordered that Mr. Costich remain available for cross-examination by De Meneses in the event De Meneses desired to cross-examine him. After having an opportunity to review the transcript, De Meneses stated that he did not desire to take advantage of the opportunity for cross examination. De Meneses also re-confirmed on the third day of the trial that he had no objection based on the fact that the trial had proceeded without his presence on the prior day.

### Uncontested Facts

DA Group is a limited liability company formed under the laws of New York. It was founded in 2002 by Benito Chinea, Brian Pfeffer and Craig, each of whom initially held 30% of the limited liability ownership interests. The holder of the remaining 10% interest was Headwaters Holdings, a broker-dealer/private equity company. In 2005, an additional owner became a member of DA Group; Chinea's ownership interest was then increased to 42%, and the ownership interests of Craig and Pfeffer were reduced to 19% each.[1]

DA Partners was also formed in 2002 as a New York limited liability company. DA Group owned 99% of the membership interests in DA Partners. Chinea was the Chief Executive Officer of DA Partners. Craig was the "Chairman" of DA Partners, though there were disputes at trial as to his actual duties. Pfeffer was named the Chief Operating Officer and later Chief Compliance Officer of DA Partners.

---

[1]    The evidence made clear that there were additional classes of membership interests in DA Group that were designed to simulate investments in certain business units of DA Partners. The owners of these interests were entitled to receive, from DA Group, distributions that were calculated by reference to the profits generated by particular businesses that DA Partners conducted. The full details of these arrangements were not disclosed at trial.

DA Partners acted as a broker-dealer that executed trades on the floor of the New York Stock Exchange, primarily for hedge funds but also for other customers. DA Partners executed trades as either an "agent" or as a "riskless principal." A "riskless principal" acts as an intermediary who buys or sells securities to fill orders that it has received from customers. The riskless principal profits by buying (or selling) securities on the market at prices that are better than those it will receive when it fills the customers' orders.

In its first year of operation, DA Partners had 12 employees and about $3.5 million in gross revenue. By 2008, DA Partners had 30 employees and more than $27 million in gross revenue. DA Partners divided its employees into groups that engaged in different types of business. Some (or possibly all) groups of employees were entitled to receive shares of the profits generated by their respective groups. DA Partners tracked the revenues and expenses associated with each such group, and the members of the group were entitled to a predetermined share of the net profits from the group's business. Craig was not an accountant, but he did track the revenues and expenses of the various groups, using Excel spreadsheets for that purpose. Craig was solely responsible for this task until 2010, when DA Partners added additional employees to assist him.

In late 2008, Chinea went to Florida to meet with several individuals associated with Lighthouse, a Florida-based broker-dealer. After meeting them, Chinea determined that they were a good fit for DA Partners and asked them to join the firm. The new group consisted of 10 to 12 people, including defendant De Meneses, and became known as the Global Markets Group or "GMG." GMG executed some equities trades for retail and institutional clients, but in 2009 and 2010 its main business was a fixed income trading business specializing in Latin American government bonds. GMG's largest client was a Venezuelan state-owned bank named Banco de Dessarollo Economico y Social de Venezuela ("BANDES").

8

Chinea agreed that the GMG group would be entitled to receive payments equal to 60% of the net profits from GMG's business. The Trustee offered deposition testimony that suggested that a written agreement was signed, but no such agreement was offered in evidence, and it is not clear that there ever was one. The people who negotiated the sharing arrangement (Chinea and Mr. Ernesto Lujan of GMG) did not testify at trial. As explained below there was some confusion as to how the sharing was supposed to work and also whether the arrangement changed over time.

De Meneses, a managing director of GMG, originally worked in Florida but moved to DA Partners' offices in New York in October 2008. In November 2008, De Meneses prepared a spreadsheet template that could be used by Craig to track revenues and expenses for GMG. De Meneses provided Craig with the necessary information each month; De Meneses testified that he in turn had obtained such information from other members of the GMG group.

In 2009, GMG generated more than $56 million of gross revenues, or roughly 75% of the gross revenues for all of DA Partners. GMG generated another $20 million of revenues in 2010, or approximately 44 percent of all of DA Partners' gross revenues. Much of the GMG revenue came from trades made for BANDES. GMG also generated expenses in the form of payments to "foreign finders" or "foreign associates," which purported to be payments in exchange for referral and sourcing services. The foreign finders and foreign associates included Haydee Paybon, Iuri Rodolfo Bethancourt, and a Panamanian company named ETC Investments.

In fact, however, much or all of the business that GMG conducted for BANDES had been obtained through illegal bribes. The bribery scheme began in 2009, after the GMG group had become a part of DA Partners. The payments made to foreign finders and foreign associates were funneled in whole or in part to Maria Gonzalez, a vice president of BANDES who supervised some of BANDES' trading operations and who had authority to direct that BANDES make trades

9

through GMG.  In 2009 and 2010, DA Partners paid roughly $9.2 million to Haydee Paybon and about $12.3 million to ETC Investments, some or all of which was transferred to Gonzalez.

The Trustee and Craig stipulated, and De Meneses agreed at trial, that Chinea learned of the bribery scheme in July 2011, and that Chinea elected to join the bribery conspiracy at that time. By this point, however, DA Partners' relationships with Gonzalez had soured.  The Trustee stipulated with Craig that BANDES stopped doing business with DA Partners when Gonzalez became displeased at delays in making payments to her, and that in January 2012 and later months Chinea attempted to revive the business.  *See* Joint Pretrial Order, Stipulation 66.  The record at trial was not very clear as to when the BANDES business was reduced, whether it ever was revived, or what revenues were derived from it in 2011, 2012 and 2013.  However, calculations submitted by Costich show that the BANDES commissions dropped drastically after early 2010 and were only a small fraction of their prior volume in 2011, 2012 and 2013.

Eventually, the scheme was uncovered.  On March 12, 2013, the Department of Justice filed a criminal complaint against two members of GMG (Tomas Alberto Clarke Bethancourt and Jose Alejandro Hurtado) as well as against Gonzalez.  The complaint accused these individuals of conspiracy to violate the Foreign Corrupt Practices Act and the Travel Act by paying and accepting bribes through foreign finders and foreign bank accounts.

News of the criminal charges was reported on the Bloomberg service, and within hours Goldman Sachs, Pershing and Merrill Lynch terminated their clearing agreements with DA Partners.  Without those agreements most of the business units of DA Partners were unable to conduct business.  DA Partners tried to find other clearing firms, but within a few days the top employees of DA Partners' other divisions were recruited by other companies or otherwise terminated their employment with DA Partners.  The capital raising group continued to function

and remained at DA Partners through 2015, according to Craig.  Craig testified that the capital raising group continued to be a "large" producer during this time, but no specifics were provided. Efforts to salvage other parts of the business failed.  Craig stayed at DA Partners to help wind down its operations, but he received no compensation after July 2013.

Another criminal complaint was filed on June 10, 2013 against Lujan of GMG, and on April 14, 2014 a further complaint was filed against Chinea and De Meneses.  The individuals who were charged in the series of indictments eventually entered guilty pleas, including De Meneses, who entered his guilty plea on December 17, 2014.  De Meneses was sentenced to four years in prison and agreed to a forfeiture judgment in the amount of $2,670,612.

The Securities and Exchange Commission also filed civil charges against Tomas Alberto Clarke Bethancourt, Hurtado, Paybon and Iuri Bethancourt on May 7, 2013.  The complaint was amended in June 2013 to add Lujan as a defendant, and in April 2014 the complaint was amended again to add Chinea and De Meneses as defendants.  The evidence shows that the District Court entered judgment against the defendants in the SEC action on April 6 and 7, 2016, including De Meneses.  The SEC judgment against De Meneses was not offered in evidence at trial, however, and its contents therefore are not known to the Court.

No criminal or civil enforcement charges were filed against Craig.  However, the Trustee contended at trial in this case that Craig was a knowing participant in the bribery scheme, or that Craig disregarded clear signs of wrongdoing.  Craig vigorously denied those contentions.

### The Challenged Payments

The Trustee seeks to recover $524,675.91 of salary payments that were paid to Craig by DA Partners during the following time periods and in the following amounts:

| Date(s) | Amount |
|---|---|
| 5/15/09-12/30/09 | $150,000.00 |
| 1/1/10-12/30/10 | $163,009.26 |
| 1/1/11-6/30/11 | $50,000.04 |
| 7/1/11-12/30/11 | $22,291.63 |
| 1/1/12-12/30/12 | $60,624.98 |
| 1/1/13-7/31/13 | $78,750.00 |
| **Total** | **$524,675.91** |

(PX 4-8.)  The Trustee contends that the salary payments constituted fraudulent transfers under the Bankruptcy Code and/or under New York State law.[2]

The Trustee also seeks to recover $2,322,955 in other payments that were made to Craig by DA Partners and by DA Group.  Craig described these payments as distributions of profits.  The challenged payments are as follows:

| Date(s) | Paid by DA Partners | Paid by DA Group |
|---|---|---|
| 7/15/2009 | $290,000.00 | |
| 8/31/2009 | $262,500.00 | |
| 9/30/2009 | $262,500.00 | |
| 10/31/2009 | $262,500.00 | |
| 12/15/2009 | $37,500.00 | |
| 3/15/2010 | $505,311.00 | |
| 4/12/2010 | | $392,272.00 |
| 8/4/2010 | | $8,000.00 |
| 8/17/2010 | | $16,000.00 |
| 03/2011 | $47,298.00 | |
| 12/15/2011 | $10,000.00 | |
| 5/15/2012 | $29,074.00 | $200,000 |
| **Totals** | **$1,706,683.00** | **$616,272.00** |

*Id*.  The Trustee contends that the payments made by DA Partners were fraudulent transfers.  He also contends that the payments made to Craig by DA Group were "subsequent transfers" of funds

---

[2]    The Bankruptcy Code refers to "fraudulent transfers," whereas the New York Debtor and Creditor Law refers to "fraudulent conveyances."  The generic term "fraudulent transfer," when used in this Opinion, is meant to cover both terms.

that DA Group had received from DA Partners through earlier transactions that were fraudulent

transfers from the perspective of DA Partners and its creditors.

The Trustee also seeks to recover $1,084,999.96 of salary payments made by DA Partners

to De Meneses after January 1, 2009.  The challenged salary payments were the following:

| Date(s) | Amount |
|---|---|
| 1/1/09-12/30/09 | $209,999.96 |
| 1/1/10-12/30/10 | $300,000.00 |
| 1/1/11-12/30/11 | $300,000.00 |
| 1/1/12-11/30/12 | $275,000.00 |
| **Total** | **$1,084,999.96** |

*Id.*  Finally, the Trustee seeks to recover $1,546,000 of other payments that were made to De

Meneses by DA Partners and DA Group and that the Trustee believes were De Meneses' shares of

revenue-sharing payments.  These payments are:

| Date(s) | Paid by DA Partners | Paid by DA Group |
|---|---|---|
| 12/31/2009 | $66,500.00 | |
| 3/15/2010 | $625,000.00 | |
| 6/3/2011 | $150,000.00 | |
| 7/19/2011 | $50,000.00 | |
| 9/22/2011 | $100,000.00 | |
| 11/22/2011 | $50,000.00 | |
| 12/22/2011 | $50,000.00 | |
| 1/11/2012 | | $100,000.00 |
| 1/23/2012 | | $50,000.00 |
| 2/21/2012 | | $50,000.00 |
| 4/17/2012 | $75,000.00 | |
| 5/16/2012 | | $25,000.00 |
| 6/20/2012 | $25,000.00 | |
| 7/19/2012 | | $25,000.00 |
| 8/22/2012 | | $25,000.00 |
| 2/19/2013 | | $79,500.00 |
| **Totals** | **$1,191,500.00** | **$354,500.00** |

*Id.*  The Trustee contends that all of the payments that were made directly by DA Partners to De

Meneses (including the salary payments) constituted fraudulent transfers under the Bankruptcy

Code and/or under New York State law. He also contends that the payments made to De Meneses by DA Group were "subsequent transfers" of earlier payments by DA Partners to DA Group that were fraudulent transfers from the perspective of DA Partners and its creditors.[3]

### The Relevant Statutes

The only claims asserted by the Trustee are claims to recover alleged fraudulent transfers. The Trustee asserts claims of actual and constructive fraud under section 548 of the Bankruptcy Code and also under New York law, in the latter case relying on the authority granted by section 544(b) of the Bankruptcy Code. Any fraudulent transfer claim by a trustee under section 544(b) or section 548 must be brought by the Trustee no later than two years after the filing of the petition unless the trustee is appointed during that two-year period. *See* 11 U.S.C. § 546(a).

The two-year deadline for the filing of fraudulent transfer claims on behalf of DA Group expired on July 22, 2015, prior to the conversion of the DA Group case to a case under chapter 7 and prior to the appointment of the Trustee in that case. No timely claims were asserted on behalf of DA Group. However, if the Trustee were to succeed in avoiding transfers that DA Partners made to DA Group the Trustee would then have the right, on behalf of DA Partners, to recover those fraudulent transfers from subsequent transferees. *See* 11 U.S.C. § 550. The Trustee therefore may recover funds transferred by DA Group if the funds transferred by DA Group can be traced to funds that DA Group received from DA Partners in prior transfers that the Trustee has the right to avoid on behalf of DA Partners.

---

[3]    Other statements by the Trustee of the amounts he seeks (for example, in the Trustee's pre-trial brief and in the Joint Pretrial Order) differ from the figures set forth above, for reasons that were not explained. The figures set forth above are taken from the exhibits that the Trustee introduced at the trial to identify the transfers that are being challenged.

14

The claims that were asserted on behalf of DA Partners were filed on April 26, 2016, which was less than two years after DA Partners filed its chapter 7 petition on May 14, 2015. Section 548 of the Bankruptcy Code allows the Trustee to challenge transfers that took place two years prior to the petition date. Only a few of the transfers that are challenged in this case – namely, salary payments to Craig that totaled approximately $31,250[4] – were made within two years prior to the commencement of DA Partners' chapter 7 case. *See* PX 4-8. The other transfers by DA Partners may only be challenged by the Trustee under New York law.

## 1.    Claims Under Section 548 of the Bankruptcy Code

Section 548(a) of the Bankruptcy Code provides that the Trustee may avoid transfers made by a debtor or obligations incurred by a debtor within 2 years before the filing of the petition, if the debtor voluntarily or involuntarily:

> (A)    made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

>> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

>> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

>> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

---

[4]    The Trustee did not identify the dates on which salary payments were made as opposed to when they were earned, so this figure is an estimate. It does not matter because (as described below) the Court has concluded that the Trustee may not recover any of these payments.

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

A transferee or obligee "that takes for value and in good faith" may retain the transferred property and/or enforce a challenged obligation "to the extent that the transferee or obligee gave value to the debtor in exchange for such transfer or obligation."  11 U.S.C. § 548(c).

## 2.    Claims Under New York State Law

The Trustee's primary claims are that the challenged payments are voidable by the Trustee as a matter of state law.  Section 544(b)(1) of the Bankruptcy Code provides that "the trustee may avoid any transfer of an interest of the debtor in property" so long as the transfer is voidable under applicable law "by a creditor holding an unsecured claim that is allowable under [11 U.S.C. § 502] or that is not allowable only under [11 U.S.C.  § 502(e)]."  DA Partners is a New York limited liability company that had its primary place of business in New York, and the parties agree that the New York Debtor and Creditor law governs any state law claims the Trustee may assert.

Fraudulent conveyance claims under New York State law generally are subject to a six-year statute of limitations, measured from the date of the challenged transfer.  *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (citations omitted).  The Trustee has not argued that the six-year statute of limitations should be tolled, extended or suspended on any ground.

The Trustee's right to pursue avoidance claims under section 544 depends on the existence, as of the petition date, of at least one actual unsecured creditor who would have had the right to pursue the relevant avoidance claims under state law.  *In re Musicland Holding Corp.*, 398 B.R. 761, 777 (Bankr. S.D.N.Y. 2008) (noting that there must be a creditor who could have avoided a transfer under state law and who also holds an allowable claim in the bankruptcy case in order for a trustee to have standing to pursue a state law fraudulent transfer claim under section 544(b)).

16

A single creditor who may pursue a particular claim is sufficient to "trigger" the Trustee's standing to pursue that claim. *Id.* (*citing MC Asset Recovery, LLC v. Southern Co.*, No. 06-cv-0417, 2006 U.S. Dist. LEXIS 97034, at \*18 (N.D. Ga. Dec. 11, 2006). Once a trustee establishes the existence of a triggering creditor, the trustee may seek to avoid a fraudulent transfer "not only for the benefit of that creditor, but also for the benefit of all of the unsecured creditors of the estate." *Silverman v. Sound Around, Inc. (In re Allou Distribs.)*, 392 B.R. 24 (Bankr. E.D.N.Y.2008). The amount of the triggering creditor's claim is irrelevant. *See* COLLIER ON BANKRUPTCY P 544.09 [5] (15th ed.2007) (a single triggering creditor provides a trustee with standing, and that standing is "not dependent at all upon the size of that creditor's claim against the debtor" because "an entire transfer can be set aside even though the creditor's claim is nominal").

Here, the Trustee has asserted claims under four provisions of the New York Debtor and Creditor Law. These four provisions differ in describing the creditors who may assert claims.

### A.    Claims Based on Alleged Insolvency – Section 273

The Trustee seeks to avoid the transfers under section 273 of the New York Debtor and Creditor Law, which states that every conveyance made and every obligation incurred by a person "who is or will be thereby rendered insolvent" is fraudulent as to "creditors," without regard to intent, if the conveyance is made or the obligation is incurred without a "fair consideration." NY DCL § 273. Section 273 refers to "creditors" generally, but unlike some other provisions of the Debtor and Creditor Law it does not refer explicitly to "future" creditors. New York courts have held that claims under section 273 may only be made by persons who were creditors at the time of the challenged transfers. *See United Nat. Funding, LLC v. Volkmann,* 25 Misc. 3d 1233(A), 906 N.Y.S.2d 776 (Sup. Ct. N.Y. Cty 2009) (permitting plaintiff's section 273 claim to survive a motion to dismiss because allegations suggested that the plaintiff may have been a creditor when

the transfers at issue were made); *see also Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 35 (S.D.N.Y. 2002) (contrasting section 273 on the one hand and sections 275 and 276 on the other and noting that the absence of the phrase "future creditors" in section 273 means that there must be a "present creditor" at the time of the transfer (citing *In re 9281 Shore Road*, 187 B.R. 837, 851 (E.D.N.Y. 1995)).

As noted above, section 544(b) only permits the Trustee to pursue claims under state fraudulent conveyance law that could have been pursued by at least one person who was an unsecured creditor at the time of the bankruptcy. *See* 18 U.S.C. § 544(b). In turn, an unsecured creditor at the time of the bankruptcy filing would only have been entitled to pursue a claim under section 273 if that creditor had also been a creditor at the time of the challenged transfer. *See Official Comm. Of Asbestos Claimants of G-I Holding, Inc.*, 277 B.R. at 35. The Trustee therefore may only pursue claims under section 273 if he identifies one or more persons who held creditor claims against DA Partners at the time of the challenged transfers *and* who continued to be creditors at the time when DA Partners filed its chapter 7 petition.

### B.    Claims Based on Unreasonably Small Capital – Section 274

The Trustee also seeks to avoid the transfers under section 274 of the NY DCL. Section 274 provides that every conveyance made without fair consideration, at a time when the person making it "is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital," is fraudulent as to creditors "and as to other persons who become creditors during the continuance of such business or transaction," without regard to actual intent. NY DCL § 274. The Trustee may pursue claims under section 274 if he identifies an unpaid creditor of DA Partners at the time of its bankruptcy filing so long as that person either was a creditor at the time of the challenged transfer or became

18

a creditor "during the continuance of" a business for which unreasonably small capital existed.

*See Official Comm. of Asbestos Claimants of G-I Holding, Inc.*, 277 B.R. at 36 (holding that

creditors who did not have claims at the time of a transfer but who became creditors while the

debtor continued to have unreasonably small capital were entitled to make claims under section

274); *Laco X-Ray Sys., Inc. v. Fingerhut*, 88 A.D.2d 425, 432, 453 N.Y.S.2d 757, 762 (1982)

(noting that section 274 requires only that there was a creditor at some point in time at which the

debtor had too little capital).

### C.   Claims Alleging an Intent or Belief that Debts Would Not Be Paid as They Matured – Section 275

The Trustee asserts claims under section 275 of the New York Debtor and Creditor Law,

which states that every conveyance made and every obligation incurred without fair consideration

"when the person making the conveyance or entering into the obligation intends or believes that

he will incur debts beyond his ability to pay as they mature" is fraudulent as to "both present and

future creditors."  NY DCL § 275.  Since "future" creditors may make claims under section 275,

the Trustee may pursue such claims so long as there was a single unpaid unsecured creditor of DA

Partners at the time of its bankruptcy filing.

### D.   Claims Alleging Intentional Fraud – Section 276

Finally, the Trustee asserts claims under section 276 of the New York Debtor and Creditor

Law, which applies to any conveyance made with "actual intent" to hinder, delay, or defraud

present or future creditors.  Section 276 provides that such a conveyance is fraudulent "as to both

present and future creditors."  NY DCL § 276.  Since section 276 permits intentionally fraudulent

transfers to be avoided by unpaid "future" creditors as well as by those who were creditors at the

time of the transfers, the Trustee has standing to pursue such claims so long as there was at least

one unpaid unsecured creditor of DA Partners at the time of its chapter 7 filing.

19

### Application of the Law to the Facts

**I.    The Trustee's Standing to Assert Claims Under New York Law**

There is no dispute that there were unpaid creditors of DA Partners at the time of its chapter 7 filing and that the Trustee therefore has standing to pursue claims under sections 275 and 276 of the New York Debtor and Creditor Law.  However, there is a serious question whether the evidence offered by the Trustee was sufficient to establish standing to pursue claims under section 273 (which requires identification of a person who was a creditor at the time of the challenged transfers and who continued to be a creditor at the time of the bankruptcy filing) and section 274 (which requires identification of a person:  (i) who was a creditor at the time of the transfer or became a creditor during the time when a business was inadequately capitalized, and (ii) who continued to be a creditor at the time of the bankruptcy).

The Trustee contended that Headwaters made a $1 million subordinated loan to DA Partners and that a portion of this loan was still outstanding when Craig received a profit distribution in 2009.  However, Headwaters was not a creditor of DA Partners.  Headwaters made a loan to DA Group (not to DA Partners), and DA Group then made a loan to DA Partners. Furthermore, the Headwaters loan to DA Group was repaid in October 2009.

In 2010, Headwaters made another $2.5 million investment, for which there was no documentation.  Witnesses disagreed as to whether the $2.5 million investment was a loan or a capital contribution, but the evidence made clear (and the Trustee later conceded) that Headwaters again transacted with DA Group, not DA Partners.  Accordingly, even if this investment were to be treated as a loan, Headwaters would only have been a creditor of DA Group, not DA Partners. Headwaters cannot be a "triggering creditor" of DA Partners by reason of the 2010 investment, because that investment did not make Headwaters a creditor of DA Partners.

20

At trial, the Trustee offered evidence that McDonald Information Services, Inc., AT&T, BATS Exchange, and Financial Library were listed by DA Partners as unpaid creditors at the time of the chapter 7 filing. However, the Trustee offered no evidence that those creditors held claims at the time of the bankruptcy filing that had existed at the time of any of the challenged transfers, or that had arisen during a period when DA Partners was allegedly conducting business with inadequate capital. Instead, the Trustee offered only very generalized testimony to the effect that there were some "disbursement[s] from DA Partners [to these creditors] in 2009, 2010, 2011, 2012, 2013, 2014." *See* 2/12/18 Tr. at 168-69 (testimony of Bernard Costich). No evidence was presented that these entities were creditors of DA Partners on the specific dates of any of the challenged transfers, or that the claims they held in the past remained outstanding at the time of the bankruptcy filing.

Creditors sometimes hold "rolling" accounts, under which new debts constantly replace old debts and the creditors (despite ongoing payments) are always in the position of holding claims against a debtor. There is some authority for the proposition that such a continuing creditor may be a triggering creditor under section 544, even if the creditor's claim at the time of the bankruptcy was arguably based on a newer transaction that post-dated the challenged transfer. *See In re Allou Distribs., Inc.*, 392 B.R. at 34 (collecting cases and noting that where a creditor was continuously owed money the claim outstanding at the time of the transfer at issue need not be the same as the claim existing as of the petition date); *In re RCM Glob. Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 523 (Bankr. S.D.N.Y. 1996) ("That they were subsequently paid for those particular services is of no consequence because they continued to provide services after the transfer for which they have still not been paid."). However, courts that have reached this conclusion have usually done so based on proof that a particular creditor held claims on an

uninterrupted basis throughout the relevant time period. *See, e.g.*, *In re RCM*, 200 B.R. at 523 (emphasizing that the finding that standing existed because of the "continu[ous]" nature of the services rendered by the triggering creditors for the debtor).

In this case, there was no evidence that any individual creditor held claims against DA Partners on an uninterrupted basis. Costich testified that in prior years there had been some transactions with four specific creditors, but not that these creditors held claims at all times. Costich also testified that he checked to see if each of the listed creditors appeared on the year-end accounts payable reports for DA Partners, and that "for the most part these entities were listed in the debtor's accounts payable at year-end." *See* 2/12/18 Tr. at 169. "For the most part" means "not always" – so that even the limited check that Costich performed showed that there were times when one or more of the identified creditors did not hold an outstanding claim.

On the other hand, although the Court raised the standing issue on several occasions, neither Craig nor De Meneses objected to the Trustee's claims on standing grounds, or asserted standing as an affirmative defense, or challenged the sufficiency of the Trustee's evidence on this issue. If a proper challenge to the Trustee's standing to make claims under sections 273 and 275 had been made, the Court would have had no choice but to sustain it based on the evidence at trial. But it would be unfair to criticize the Trustee for not offering better evidence on an issue that the defendants did not contest. The Court therefore will not dismiss the claims on standing grounds.

## II.    Some of the Trustee's Claims Are Time-Barred

### A.    Claims Regarding Transfers Made by DA Partners Before May 14, 2009

Among the payments that the Trustee seeks to recover are salary payments made by DA Partners to De Meneses between January 1, 2009 and May 14, 2009. However, the Trustee's claims under the New York Debtor and Creditor Law are subject to a six-year statute of limitations.

DA Partners filed its chapter 7 petition on May 15, 2015. The Trustee cannot assert claims for which the statute of limitations expired prior to that date. *See* 11 U.S.C. §§ 108(c), 544, 546(a).

The Trustee conceded at trial that claims regarding payments to Craig on or before May 14, 2009 are time-barred. He made no similar concession as to De Meneses, but he also offered no reason why the conclusion should not be the same. Accordingly, the claims as to payments to De Meneses that were made on or before May 14, 2009 are time-barred.[5]

## B.    Claims Arising out of Transfers Made by DA Partners to DA Group on or Before May 14, 2012

As noted above, the Trustee seeks to recover various payments that were made to Craig and De Meneses by DA Group. The Trustee contends that DA Group transferred funds that DA Group had previously received through prior fraudulent transfers from DA Partners. More particularly, the Trustee's witness, Brian Ryniker, testified at trial that in 2009 and 2010 DA Partners transferred a total of $15 million to DA Group and that each of these transfers represented an equity distribution from DA Partners to its 99% owner and member, DA Group. The Trustee contends that the transfers by DA Partners to DA Group were fraudulent under the New York Debtor and Creditor Law, and that under the Bankruptcy Code the Trustee has the right to recover the transfers from "subsequent transferees" such as Craig and De Meneses. *See* 11 U.S.C. § 550.

However, the Trustee's contentions bring a different obstacle into play. Under New York law, claims to recover distributions by a limited liability company to its limited liability company members are subject to a three-year statute of limitations, rather than the six-year statute of limitations that ordinarily would apply. This is because section 508(c) of the New York Limited

---

[5]    The amounts of the pre-May 14, 2009 payments to De Meneses are not clear, because the Trustee's exhibit showed the time periods for which salary payments accrued, but not the dates on which payments were made. However, the amount does not matter in light of the disposition of the Trustee's other claims as set forth below.

Liability Company Law provides that "a member who receives a wrongful distribution from a limited liability company shall have no liability under this article *or other applicable law* for the amount of the distribution after the expiration of three years from the date of the distribution." NY LLCL § 508(c) (emphasis added).  Courts have applied this three-year time limit to avoidance actions under 11 U.S.C. § 544 and under the New York Debtor and Creditor Law.  *See O'Connell v. Shallo (In re Die Fliedermaus LLC)*, 323 B.R. 101, 108 (Bankr. S.D.N.Y. 2005); *see also Board of Mgrs. of Chocolate Factory Condominium v. Chocolate Partners, LLC*, 992 N.Y.S.2d 157 (Sup. Ct. N.Y. Cty. 2011); *Flowers v. 73rd Townhouse LLC,* No. 651036/2010E, 2011 N.Y. Misc. LEXIS 6893, at *7-9 (Sup. Ct. N.Y. Cty. June 24, 2011), *rev'd on other grounds*, 99 A.D.3d 431, 951 N.Y.S.2d 393 (1st Dep't 2012); *Mostel v. Petrycki*, 885 N.Y.S.2d 397, 399 (Sup. Ct. N.Y. Cty. 2009); *Williamson v. Culbro Corp.*, 41 A.D.3d 229, 231-32, 838 N.Y.S.2d 524, 526-27 (1st Dep't 2007) (applying an analogous provision in the New York Partnership Law and confirming that it imposes a three-year limit on any claim to undo or recover a distribution paid to limited partners); *Peckar & Abramson, P.C. v. Lyford Holdings, Ltd.,* No. 100005/09, 2009 N.Y. Misc. LEXIS 6376, at *13-15 (Sup. Ct. N.Y. Cty. Dec. 24, 2009) (same); *but see Lyman Commerce Solutions, Inc. v. Lung*, No. 12 Civ. 4398, 2015 U.S. Dist. LEXIS 51447, at *13-14 (S.D.N.Y. Apr. 20, 2015) (declining to follow prior New York decisions and holding that section 508 of the Limited Liability Company Law did not supplant the ordinary six-year statute of limitations for fraudulent conveyance claims).

In his post-trial brief, the Trustee discusses section 508 of the Limited Liability Company Law as though it is relevant only to the transfers made by DA Group itself.  The Trustee concedes that he is time-barred from seeking to recover the payments that DA Group made to Craig prior to May 14, 2012, because Craig was a limited liability company member of DA Group and received

those amounts as equity distributions from DA Group. The Trustee also argues that De Meneses was not a member of DA Group and therefore that section 508 should not apply to the transfers that DA Group made to De Meneses. But in making these arguments the Trustee has focused on the wrong transfers. The Trustee has not asserted (and cannot assert) fraudulent transfer claims on behalf of DA Group itself, for the reasons noted above. The Trustee challenges payments that DA Group made on the theory that they are "subsequent transfers" of funds that were fraudulently transferred by DA Partners, but the Trustee can only pursue such claims if the Trustee has the right to avoid the underlying transfers that DA Partners made to DA Group.

Section 550 provides a potential remedy against subsequent transferees, but the wrong for which that remedy is provided "is the initial transfer that fraudulently depletes the estate." *In re Picard*, 917 F.3d 85, 99 (2d Cir. 2019). For that reason, section 550 makes clear that a trustee may only recover transfers from subsequent transferees if the initial transfer itself "is avoided." *See* 11 U.S.C. § 550(a). Here, transfers made by DA Partners to DA Group prior to May 14, 2012 have not been and cannot be avoided by the Trustee, because those initial transfers represented distributions by DA Partners to its 99% limited liability company owner (DA Group) and because the New York Limited Liability Company Law imposes a three-year limit on any claim to avoid such transfers. If the Trustee has not avoided the initial transfers and cannot avoid them, then the Trustee cannot use section 550(a) to recover property from subsequent transferees. *See In re Picard*, 917 F.3d at 97. Accordingly, claims to recover alleged subsequent transfers to Craig and De Meneses are barred to the extent that they are based on initial transfers that DA Partners made to DA Group prior to May 14, 2012. The Trustee may only seek to recover "subsequent transfers" by DA Group to the extent that they have their origins in transfers that DA Partners made to DA Group *after* May 14, 2012.

Six of the challenged payments that DA Group made to Craig and De Meneses were made by DA Group *prior* to May 14, 2012. These pre-May 14, 2012 transfers could not possibly have had their origins in transfers that were made by DA Partners *after* May 14, 2012. The Trustee therefore cannot establish that these alleged "subsequent transfers" originated from initial transfers that the Trustee has the right to avoid. The six relevant transfers are:

| Date | Recipient | Amount |
|------|-----------|--------|
| April 12, 2010 | Craig | $392,272 |
| August 4, 2010 | Craig | $  8,000 |
| August 17, 2010 | Craig | $ 16,000 |
| January 11, 2012 | De Meneses | $100,000 |
| January 23, 2012 | De Meneses | $ 50,000 |
| February 21, 2012 | De Meneses | $ 50,000 |

### III.   The Trustee Failed to Prove That Other Payments by DA Group Were Subsequent Transfers of Funds that Had First Been Fraudulently Transferred by DA Partners on or After May 14, 2012

The Trustee seeks to recover five payments that Craig and De Meneses received from DA Group after May 14, 2012:

| Date | Recipient | Amount |
|------|-----------|--------|
| May 15, 2012 | Craig | $ 200,000 |
| May 16, 2012 | De Meneses | $ 25,000 |
| July 19, 2012 | De Meneses | $ 25,000 |
| August 22, 2012 | De Meneses | $ 25,000 |
| February 19, 2013 | De Meneses | $ 79,500 |

The Trustee failed to prove that these payments were subsequent transfers of funds that DA Group had initially received through transfers that were made by DA Partners on or after May 14, 2012 and that the Trustee has the right to avoid.

The Trustee did not identify any particular post-May 14, 2012 transfers from DA Partners that allegedly were the sources of the post-May 14, 2012 payments that DA Group made to Craig and De Meneses. In fact, Ryniker openly acknowledged that he could not trace any of the post-

26

May 14, 2012 payments by DA Group to any prior transfer from DA Partners (no matter when the initial transfer was made), because prior to May 2012 DA Group had received funds from other sources as well. The largest such infusion came when Lake Avenue Capital provided $2.5 million to DA Group in December 2011. The intent was to provide cash that DA Group would then use to capitalize DA Partners. However, only $1.3 million of this amount was transferred to DA Partners; the remaining $1.2 million stayed with DA Group, providing DA Group with funds that it did not receive from DA Partners.

Craig also made a short-term loan of $200,000 to DA Group in March 2012. Craig testified that this money was never contributed to DA Partners and that it was the source of the $200,000 payment that DA Group later transferred back to Craig in May 2012. The exhibits supported this testimony, and no contrary evidence was offered.

The existence of other sources of funds might not have been fatal if the Trustee had offered proof that at least some minimum part of the funds paid out by DA Group must have originated in avoidable payments that DA Partners had made to DA Group on or after May 14, 2012, based on evidence as to the overall cash movements in and out of DA Group during relevant periods. But the Trustee did not offer such evidence, or any other evidence from which the sources of the payments made by DA Group might reasonably be traced. Despite the Court's many admonitions as to the need for a careful tracing of funds, the Trustee did not provide one. Instead of showing actual cash balances and cash movements, the Trustee relied on general arguments to the effect that DA Partners must have been the source of all monies paid out by DA Group, because DA Group conducted no separate business of its own. The evidence showed that this assumption was unwarranted and that DA Group received other funds from other sources.

It is the Trustee's burden to show that the monies that Craig and De Meneses received from DA Group were subsequent transfers of monies that DA Group initially received through avoidable fraudulent transfers from DA Partners. *See In re Nieves*, 648 F.3d 232, 237 (4th Cir. 2011) (noting that a bankruptcy trustee must "establish[] that a party is an immediate or mediate transferee of the initial transferee" to claw back a subsequent transfer); *Nisselson v. Salim (In re Big Apple Volkswagen, LLC)*, No. 11-11388 (JLG), 2016 WL 1069303, at *19 (Bankr. S.D.N.Y. Mar. 17, 2016) ("[P]laintiff bears the burden of establishing that the assets at issue are estate property" when he is "seeking to recover a fraudulent transfer from a subsequent transferee under § 550(a)(2) of the Code") (citations omitted); *Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) (dismissing section 550 subsequent transfer claim because the trustee failed to "tie any initial transfer to any subsequent transfer"). The Trustee has not done so and the Trustee's witness admitted that he cannot do so.[6] These claims therefore fail.

## IV. The Evidence Showed That DA Partners Was Not Insolvent at the Times of the Challenged Transfers

"Insolvency," for purposes of section 548 of the Bankruptcy Code, is determined by comparing the sum of an entity's debts to a fair valuation of its assets. *Tronox v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 296 (Bankr. S.D.N.Y. 2013). New York law similarly provides that a person is insolvent when "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become

---

[6]    Even if the Trustee were not barred from challenging the 2009-10 transfers by DA Partners to DA Group, the Trustee's evidence still would have been insufficient. The Trustee identified $15 million of transfers that DA Partners made to DA Group in 2009 and 2010. However, the Trustee offered no evidence as to what cash DA Group held prior to those transfers, or as to other receipts DA Group had or other payments that DA Group made, or any other information that would show that the payments that DA Group made to Craig and De Meneses could or should be traced back to the challenged 2009-10 transfers as opposed to other sources.

absolute and matured." NY DCL § 271; *In re Operations NY LLC*, 490 B.R. 84, 97 (Bankr. S.D.N.Y. 2013). For this purpose, "assets" include all property that is not exempt from liability for the payment of debts, and "debts" include "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." NY DCL § 270.

Insolvency is a question of fact that must be determined under the circumstances of each particular case. *E.g.*, *Deflora Lake Dev. Assocs., Inc. v. Hyde Park,* No. 13-CV-4811, 2016 WL 7839191, at *3 (S.D.N.Y. June 9, 2016), *aff'd*, 689 F. App'x 93 (2d Cir. 2017), and *aff'd*, 689 F. App'x 99 (2d Cir. 2017). Insolvency must be measured as of the date(s) on which the challenged transfers occurred, and "cannot be presumed from subsequent insolvency at a later point in time." *O'Toole v. Karnani (In re Trinsum Grp.)*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011).

The solvency of a business is usually calculated based on the revenues that the business may generate as a going concern, and not based on the present liquidation value of its assets. *See Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007); *In re PWS Holding Corp.*, 228 F.3d 224, 233 (3d Cir. 2000). This is particularly true for a service business such as a brokerage firm, a law firm or an accounting firm; the main values of such businesses are the net revenues they generate, not the unpaid receivables they have already generated or the hard assets they already hold. Courts have consistently held that in determining solvency at a particular point of time the value of a business (and the value of individual assets owned by a business) should be computed on a going concern basis, unless the demise of the business is so clearly imminent that the business is incapable of generating any ongoing revenues. *See, e.g.*, *In re Trans World Airlines, Inc.*, 134 F.3d 188 (3d Cir. 1998); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3rd Cir. 1992) (proper to use sale values that presumed a going concern unless bankruptcy was "clearly imminent"); *In re Taxman Clothing*

*Co.*, 905 F.2d 166, 169-70 (7th Cir. 1990) (going concern valuation should be used unless the "business is on its deathbed"); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 131 (Bankr. D. Mass. 1989) (holding that solvency is to be measured by the going concern value of a business and "not the liquidation value of its assets less its liabilities"); *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd.)*, 93 B.R. 333, 341 (E.D. Pa. 1988) (going concern values should be used unless company is "on its deathbed").

As noted above, many of the transfers made to Craig were described by Craig and his counsel as profit distributions. Some New York courts have held that if a plaintiff shows that a transfer has been made without fair consideration, there is a rebuttable presumption of insolvency that shifts the burden to the defendant to show continued solvency after the transaction. *Geo-Grp. Commc'ns, Inc. v. Chopra*, No. 15 CIV. 1756 (KPF), 2016 WL 390089, at *7 (S.D.N.Y. Feb. 1, 2016) (considering the issue at the pleading stage); *Amusement Indus., Inc.*, 820 F. Supp. 2d 510, 527 (S.D.N.Y. 2011) (*quoting RTC Mortg. Trust 1995–S/N1 v. Sopher*, 171 F. Supp. 2d 192, 199 (S.D.N.Y. 2001)); *see also Official Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 551, 553 (Bankr. S.D.N.Y. 2015). Costich (in his expert witness report) cited to such decisions. However, the Trustee did not argue that the defendants bore the burden to prove the firm's solvency. Instead, the Trustee submitted a pretrial brief that stated that, under New York law, the Trustee bore the burden of proof as to "insolvency" as well as to whether DA Partners had adequate capital. *See* Trustee's Pretrial Brief [ECF No. 74], at 19. The Court also directed the parties to submit a pretrial order that identified the legal and factual issues for trial, and Craig and the Trustee agreed that the Court would have to decide whether the Trustee carried "his burden" of proving insolvency. *See* Joint Pretrial Order [ECF No. 60] at 35, item V(8).

In the end, however, it does not matter which party had the burden of proof, as the Court has considered all of the evidence and has decided on the basis of the evidence that DA Partners was not insolvent at the times of the challenged transfers.

### A. The Trustee Improperly Ignored the Going Concern Value of DA Partners Prior to July 1, 2011

The Trustee's contentions about DA Partners' solvency were based primarily on the testimony of Mr. Costich and to a lesser extent on the testimony of Mr. Ryniker. Costich and Ryniker each testified that they believed certain adjustments should have been made to DA Partners' financial statements to reflect liabilities that either were not recorded at all or that were not recorded on a timely basis. The types of adjustments they made were similar, though as described below there were significant and unexplained differences in the adjustments they made. Costich then testified that in his opinion, based on the adjustments that he proposed, DA Partners was insolvent as of no later than May 31, 2009.

Costich acknowledged under questioning by the Court that in determining the solvency of a firm one ordinarily should consider the discounted value of the revenues that the firm may generate as a going concern. However, Costich made no effort to evaluate the going concern value of DA Partners at any time. Instead, he offered "solvency" calculations that were based solely on the immediate liquidation value of DA Partners' assets, and on the assumption that no further revenues or profits could be expected. Costich offered two reasons for this approach.

First, Costich testified that he understood that DA Partners was not actually in compliance with SEC net capital rules and therefore would not have been a good acquisition candidate for the sale of its businesses. Costich himself did not purport to be an expert in net capital rules or net capital calculations; in offering this testimony Costich apparently relied on the testimony of Ryniker. For the reasons that are further explained below, however, the Court

31

finds that many of Ryniker's proposed adjustments to DA Partners' net capital calculations were not proper. A corrected version of Ryniker's own calculations would have shown either no net capital issues or only small temporary issues that could have been quickly and easily rectified.

More importantly: Costich's assumption that a net capital issue by itself would have led to the downfall of the entire firm, and a complete loss of the going concern value of all of its separate business lines, was unsupported and was not credible. Even if the firm as a whole had a net capital problem (as Costich assumed), there is no common-sense reason why that would or should have stopped another firm from buying one or more of DA Partners' profitable business units. No witness testified who professed to be an expert about net capital rules or net capital computations, and no competent witness testified as to the likely effects of any net capital issues on the ability of DA Partners to continue in business or to realize the "going concern" value of some or all of the profitable businesses that DA Partners conducted.

Furthermore, Costich treated DA Partners as though it had no going concern value starting in early 2009. However, even Ryniker's calculations (without the Court's corrections) showed that DA Partners was in compliance with net capital rules during most of 2009. Costich's decision to ignore going concern values cannot be justified based on alleged "net capital" issues at times when Ryniker did not identify any such issues.

The second (and main) reason why Costich ignored going concern values is that Costich assumed that DA Partners' business should be treated as though it were dead from the outset of the bribery scheme, with the pronouncement of death just awaiting the discovery of the bribery scheme by regulators. This, too, was an unsupported assumption.

The evidence at trial showed that most of DA Partners' businesses did come to a halt shortly after the filing of criminal charges against three GMG executives in March 2013. The

32

criminal charges prompted an almost immediate abandonment of DA Partners by the firms who cleared trades for it. Craig testified that some efforts were made to save other parts of DA Partners' business, but untainted employees quickly arranged their departures to other firms, and in very short order it was clear that most of the business could not be salvaged.

However, there was no evidence at trial to support the notion that the same thing would have happened if the bribery scheme had been discovered at an earlier time. If (for example) the bribery scheme had been discovered in mid-2009 – less than a year after it began, long before Chinea allegedly learned of and joined in the scheme, and at a time when the scheme was confined to the relatively new employees in the GMG group – it is not reasonable to believe that the entire firm would have collapsed. At least, not a shred of evidence was offered to support the contention that it would have done so. Costich was qualified as an expert only on accounting issues and solvency calculations generally. The determination as to whether (and when) the discovery of the GMG bribery scheme would have brought an end to the entire business was beyond his expertise.

There was no suggestion at trial that DA Partners was insolvent if its ability to earn further revenues were to be considered and if the values of its separate business units were to be calculated on a going concern basis. Craig testified at trial (without contradiction) that business units other than GMG generated $20 million of revenues in 2010, $25 million in 2011 and "more so in 2012." *See* 2/23/18 Tr. at 57. He also testified that the capital raising group at DA Partners did not terminate its operations when the 2013 charges were filed and that it continued to function and to generate revenues until 2015. Ryniker likewise admitted during his testimony that the capital raising unit continued to generate fee revenues even after May 2013. The evidence showed that DA Partners was not delinquent in the payment of any bills as they came due in 2009 and 2010.

33

DA Partners continued in business for almost four years after the date when Costich treated the firm's death as an imminent certainty.

The ability to generate revenues, and the ongoing values of various business units, should not have been disregarded unless and until such time as the BANDES bribery scheme had done so much damage to the firm that no portion of the firm could be rescued and no operations could continue. Costich's assumption that the death of the entire firm was imminent from the very outset of the bribery scheme, and the firm should be treated as though it had no earning capacity at all, was unsupported and unreasonable.

Nevertheless, the speed with which most of the business ended once criminal charges were filed suggests that DA Partners likely did reach a point, before March 2013, at which the termination of its ongoing businesses became inevitable. Unfortunately, the parties offered little or no evidence to assist the Court as to just when this point might have been reached, or when death was so certain that liquidation values (not ongoing going concern values) could reasonably be considered in measuring the solvency of DA Partners.

The Court suggested at trial that one possible turning point could have been July 2011, which is the time when the parties have stipulated that Chinea learned of the bribery scheme and decided to join in it. The testimony at trial showed that Chinea was the senior officer and wielded almost unfettered authority as to how the business was conducted. Craig has implicitly endorsed this approach; in his post-trial brief, Craig argued that the Trustee had failed to prove that DA Partners was insolvent prior to July 2011, on the ground that the Trustee had failed to consider (among other things) the going concern values of DA Partners' businesses before that time.

It is not at all clear from the evidence that July 2011 was really the point when the death of the firm and the termination of its ability to do business became inevitable, as opposed to some

earlier or later date.  On the one hand, when the March 2013 indictments were announced there were no charges against Chinea or against DA Partners itself; the indictments were confined to members of the GMG group.  Nevertheless, most of the business lines failed almost immediately after the March 2013 indictments became public.  This suggests that public awareness of Chinea's personal involvement in the scheme may not have been the key factor in the firm's demise.

On the other hand, there is nothing in the record to support the contention that the firm would have ceased to function if Chinea had acted promptly to root out the wrongdoers and to deal openly with regulators when Chinea discovered the illegal bribes in July 2011, instead of joining in the illegal scheme.  Furthermore, the end of DA Partners' ongoing operations was not "imminent" in July 2011.  The firm as a whole continued in business until March 2013.  One business (the capital raising unit) continued to operate until 2015.

In the absence of any better evidence, and with considerable misgivings, the Court concludes that Chinea's joinder in the bribery scheme in July 2011 is the earliest date on which, in hindsight, the demise of the firm could be considered to have become inevitable, and therefore as the earliest date when liquidation values (as opposed to going concern values) could reasonably be used in assessing the firm's solvency (or as further discussed below, the adequacy of the firm's capital).  Ultimately the precise date does not matter, however, because even if liquidation values were used to measure DA Partners' solvency, the evidence still showed that DA Partners was solvent at the times of all of the challenged transfers.

### B.    Even if Liquidation Values Were Considered, the Evidence Showed that DA Partners Was Not Insolvent at the Time of the Challenged Transfers

Costich and Ryniker accepted the accuracy of most parts of DA Partners' financial statements and FOCUS reports.  They identified some assets that should be written down or that were fictitious, but they contended primarily that various liabilities should have been recorded

that either were not recorded at all or were not recorded on a timely basis. There were numerous problems and errors, however, in the calculations that Costich and Ryniker prepared, and in the substance of the corrections that they suggested.

### (1)    Unexplained Differences Between Ryniker's and Costich's Figures

Ryniker and Costich each prepared spreadsheets showing the accounting corrections that they believed were warranted. However, for some items the corrections that the two witnesses proposed are materially different. The tables that are attached as Exhibits A and B to this opinion show the differences between Ryniker's proposed adjustments and Costich's proposed adjustments. The two sets of calculations are substantially similar for 2009 but differ considerably thereafter. The calculations were offered at trial with no explanation of why they differed. The Court has searched the record but it does not contain supporting information that would permit the two competing sets of calculations to be reconciled. The unexplained differences raise doubts about the methodologies that were used and the accuracy of the compilations that were presented.

### (2)    Disparities Between Costich's Solvency Calculations and Other Uncontradicted Evidence

Costich's conclusions cannot be squared with other undisputed evidence. In 2009, Craig's spreadsheets showed that GMG revenues were $56 million and that after all associated expenses were taken into account – including all liabilities owed to foreign finders and foreign associates and all other associated costs – there was a net profit of $25 million, of which 60% (or $15 million) would have belonged to GMG and $10 million would have been left for DA Partners. According to the calculations offered by Costich, however, a proper recording of liabilities to the foreign finders and of GMG's profit share in 2009 – even ignoring other

adjustments that Costich proposed – would have led to a *decrease* in DA Partners' overall equity

in 2009, causing it (according to Costich) to reach negative values.

DA Partners did not owe anything to GMG unless the GMG business was profitable.

Furthermore, the GMG business was not profitable unless the revenues exceeded all expenses –

including, among those expenses, all of the amounts owed to foreign associates and foreign

finders. If GMG was entitled to a 60% profit share, then there had to be a 40% net profit balance

to which DA Partners was entitled. How, then, could a proper accounting of the GMG expenses,

and of GMG's profit share, possibly have led to a *reduction* in the overall value of DA Partners?

The Court has spent considerable time reviewing the transcripts of the testimony of Costich and

also of Ryniker, as well as the exhibits submitted in connection with their testimony, and has

found no explanation.

In theory, DA Partners might have made distributions to its owners that resulted in a net

negative effect on its solvency. However, the alleged "profit" distributions that DA Partners

made to its three founders in 2009, plus a loan repayment that DA Partners made to DA Group

that year, totaled significantly less than the $10 million share of profits that DA Partners received

from the GMG business alone.

Another possibility is that other business units of DA Partners might have incurred huge

losses, and if that happened the losses certainly could have offset the profits generated by GMG.

But there was no evidence, or even hint, that any such thing occurred. The evidence at trial was

that the other business units of DA Partners had generated profits in prior years, and that those

units (and newer business units) continued to generate net profits from 2009-2013. As noted

above, Craig testified (without contradiction) that business units other than GMG generated $20

million of revenues in 2010, $25 million in 2011 and "more so in 2012." *See* 2/23/18 Tr. at 57.

Large increases in overhead expenses also might have explained why DA Partners'
financial condition might have suffered notwithstanding the addition of a hugely profitable
business line. But the only evidence of expense changes at trial was that rent costs increased
after an office relocation. That expense difference was too small to explain how DA Partners'
40% profit share from the GMG business could have been entirely used up and how there could
have been a net decline in DA Partners' value despite the hugely profitable GMG business.

The theory of the adjustments that Costich proposed was that all revenues that were
accrued for a given month should properly be aligned with the expenses incurred in generating
those revenues. Mathematically, however, there could not have been any 60% profit share owed
to GMG in a given month unless the GMG business generated enough revenues during that same
month to cover all of its expenses (including amounts owed to foreign finders and foreign
associates) and unless there were enough left over, after those expenses, to cover not only
GMG's 60% profit share but also to contribute a 40% profit share to DA Partners – the effect of
which would have increased (not decreased) DA Partners' net value. To put it another way: the
proposed accruals for amounts owed to GMG presume that the business generated a large profit,
and a proper accounting for a business that generated a large profit cannot, by itself, result in a
reduction in the firm's value. In the absence of any evidence of any other circumstances that
could have caused DA Partners to decline in value, notwithstanding this profit contribution, the
Court can only conclude that there is a failure in Costich's calculations to match liability accruals
with actual revenue accruals, or a failure to recognize some liability and expense accruals that
already appeared in DA Partners' records, or some other error that renders Costich's
computations unreliable.

### (3)    Unsupported Adjustments for Alleged Claims Against Auditors and Alleged Liabilities to the SEC and to BANDES

In assessing DA Partners' solvency Costich made three large after-the-fact adjustments to DA Partners' assets and liabilities for which no proper evidentiary support was offered.

First, Costich concluded that DA Partners should be given credit for an unrecorded asset in the form of a potential claim against its outside auditors. Costich assigned a $24 million value to this claim and accrued it on his schedules beginning in February 2010. No evidence was offered as to the basis on which a claim could have been asserted against the auditors, or how the auditors' behavior had allegedly injured DA Partners, or how the proposed $24 million value of a potential claim had been calculated. There were references during the trial to the fact that DA Partners had recently settled a claim against its former auditors, but that was all; there was no evidence even as to the amount of the settlement.

Neither Craig nor De Meneses challenged this particular adjustment – after all, it represented a large additional asset rather than a liability. If the Court were to accept Costich's proposed value of the claim against auditors (based on a lack of opposition), then in light of the Court's rulings about Costich's other proposed adjustments it would be plain that DA Partners was solvent at all times from and after February 2010. However, the Court believes that all of Costich's proposed adjustments should be considered together, and that they should be disregarded if there was insufficient support for them. The record did not support this proposed adjustment, and so the Court has disregarded it.

Second, Costich presumed that DA Partners had a "potential liability" to the Securities and Exchange Commission in an amount equal to one-half of all of the commissions that DA Partners received from BANDES. The sole supporting evidence for this proposed accrual was Costich's testimony that the SEC had filed a proof of claim during the bankruptcy case that generally

preserved the SEC's rights to seek penalties, disgorgement and interest resulting from "possible violations of the federal securities laws."  However, the SEC never filed any proceeding against DA Partners and never sought any penalties or disgorgement.  No evidence was offered showing that DA Partners actually owed any liability at all to the SEC at any time.  Nor was any evidence offered to support Costich's assumption that DA Partners might be liable to the SEC in an amount equal to one-half of all the commissions received from the BANDES business.

Third, Costich presumed that DA Partners had a "potential liability" to BANDES in an amount equal to one-half of all of the commissions that DA Partners received from BANDES. Again, no evidence was offered to support this assumption.  The evidence showed that GMG associates paid bribes to Ms. Gonzalez, but there was also no showing that BANDES (as a knowing participant in the scheme through Ms. Gonzalez) would have been entitled to assert a claim against DA Partners.  There was also no evidence that the bribes led to any transactions that were not legitimate trades, or that the bribery scheme resulted in anything other than the allocation of trades to DA Partners that otherwise would have been made through other firms, or that the commission charges that BANDES paid were any different from the commissions it would have paid if Ms. Gonzalez had not steered transactions to DA Partners as opposed to other firms.  The SEC's complaint contained allegations that GMG employees might have churned the BANDES account or engaged in unauthorized trades, but no evidence of such conduct was offered at trial, and for the reasons stated above the Court finds that the mere fact that the SEC allegations were offered into evidence is not by itself sufficient to prove the truth of any of the matters contained in those allegations.  The only evidence offered at trial on these issues was the testimony by De Meneses, who testified that the only effect of the bribery scheme was to channel legitimate trades to DA Partners rather than to other firms.

The effect of positing the proposed liabilities to the SEC and to BANDES was particularly absurd given other assumptions and adjustments that Costich made. For example, Costich concluded that DA Partners actually owed payments to foreign finders, foreign representatives, GMG employees and to the GMG group itself based on the BANDES commissions that were received and based on the profits that the GMG business generated. He also argued that larger monthly accruals for those liabilities should have appeared on DA Partners' financial statements. But if DA Partners had liabilities to the SEC and BANDES that would have required DA Partners to disgorge all of the BANDES commissions, then surely DA Partners could not still have been obligated to pay the foreign finders and foreign associates a percentage of those same commissions. Similarly, if DA Partners had liabilities to the SEC and BANDES that were equal in amount to the entire gross revenues generated by the BANDES business, then there would not have been any "profits" to be shared with GMG, and there would have been no basis for an accrual of any such liability. When the Court questioned Costich about these points, he acknowledged that his assumptions had overstated the potential liabilities.

It is certainly not unreasonable to think that DA Partners incurred liabilities of some nature if it obtained business by bribery. However, in fact no such liabilities actually materialized. The SEC reserved its rights to make a claim, but ultimately neither the SEC nor BANDES pursued a claim against DA Partners. As noted above, the Trustee for the most part accepted the accuracy of DA Partners' periodic financial statements, subject to certain specific changes that the Trustee thought were warranted. If the Trustee believes that liabilities actually were owed to the SEC and to BANDES – despite the fact that the SEC and BANDES did not pursue them and despite the fact that the firm never had to realize any such liabilities – and if the Trustee believes that DA Partners' financial reports were inaccurate by failing to reflect such liabilities, then it was incumbent on the

Trustee to provide some competent evidence that the liabilities actually existed and in what amounts. In this case, there was no competent evidence that such liabilities existed, or in what amounts. Costich is an attorney, but he was qualified as an expert only on accounting issues and on solvency calculations generally. He was not qualified as an expert on legal matters, or SEC investigations, or the liabilities that brokers might incur to regulators or to customers if they engage in activities that violate anti-bribery statutes, or how fines or disgorgement awards typically are calculated. He was not qualified to testify as to whether the purported liabilities to BANDES and to the SEC were real liabilities, or as to the proper calculation thereof. Costich's inclusion of these items in his expert report, without supporting evidence, was nothing more than result-oriented guesswork and was not credible.

As with many other issues that are addressed in this Opinion the Court cannot help but think that better evidence could have been offered that might have led to different results. However, based on the trial record the Court must disregard these proposed liability adjustments.

### (4)    Accruals of Liabilities to Foreign Finders and Associates

It is a basic principle of proper accounting that expenses that are incurred in the course of producing revenue ought to be accrued at the same times as the associated revenues are accrued. If revenue is received before an associated expense is actually paid, the expected future expense ought to be booked as an accrued liability. Such a proper matching of the timing of revenues and associated expenses is important in presenting an accurate picture of the results of a firm's operations and of the actual financial condition of the firm at a given point in time.

The Trustee contended at trial that DA Partners violated these accounting principles in the way it accounted for payments owed to foreign finders and foreign representatives. Ryniker and Costich testified that DA Partners recorded payments to foreign finders and foreign

associates as expenses when the payments were actually made but did not accrue liabilities for such amounts during the months when the associated revenues were booked.

It is very peculiar, though, that the Trustee seeks to treat these obligations as legitimate "liabilities" in measuring the capital and solvency of DA Partners on a liquidation basis. The gist of the Trustee's contentions at trial was that Paybon, ETC and others were characterized as foreign finders and foreign associates, but that they did not actually provide any legitimate services in those capacities. Instead, the amounts paid to them were just a disguised way of transmitting illegal bribes to Maria Gonzalez. The Trustee himself contends that the whole notion that there were liabilities that were "owed" to "foreign associates" and "foreign finders" was a sham. Section 270 of the New York Debtor and Creditor Law calls for an assessment of a firm's "legal" liabilities in measuring solvency. The purported finders and associates did not provide real services, and there was no legal obligation to pay them for fictitious services.

Perhaps a business that is operating as a going concern ought to make timely accruals for amounts it expects to pay, even if the payments are not legal; that particular nuance of accounting practice was not explained at trial. But this just brings up another problem. As explained above, Costich argued that DA Partners' solvency should not be calculated on a going concern basis. Instead, he argued that it should be calculated as though the bribery scheme had brought about the immediate death of the firm and eliminated any hope of continuing revenues. But that assumption has to be applied consistently in measuring both the assets and liabilities of the firm. If the value of the DA Partners business is going to be calculated on the assumption that the bribery scheme had been revealed and had destroyed the firm and its entire earning capacity, then that same assumption must be applied in determining whether any "liabilities" actually were owed to foreign associates and foreign finders. It is plain from the Trustee's own

43

contentions that any such purported liabilities were illusory and that if the bribery scheme had been revealed these amounts would not have been treated as true liabilities. Accordingly, if the solvency of DA Partners is measured on the assumption that the bribery scheme had brought about its demise (which is the assumption Costich used to justify his disregard of going concern values), then no "liabilities" should be treated as owing to foreign associates and foreign finders.

### (5)    Discretionary Bonuses

Costich added accruals for certain "House Accounts" based on his understanding that they represented accruals for non-discretionary bonuses. However, the uncontradicted evidence at trial was that these amounts represented possible discretionary bonuses that DA Partners might pay to certain employees of GMG. Costich testified that proper accounting practice is to accrue for bonuses that a business expects to pay, and that makes sense when accounting for a business on a going concern basis. But once again, the solvency calculations that Costich has offered are based on the assumption that there was no going concern and that the business was closing its doors. If that assumption is applied to the valuation of the firm's assets, then the same assumption needs to govern the valuation of the firm's liabilities. By definition there was no legal liability to pay "discretionary" bonuses. If the business had in fact collapsed (which is the assumption Costich applied in measuring asset values), then surely the discretionary bonuses for members of the GMG group would not have been paid and would not have constituted "liabilities" of the business. Accordingly, if the solvency of DA Partners is measured on the assumption that the firm had closed its doors and was immediately liquidating (as Costich posited), then in that case one could not reasonably treat the house reserve accounts as "liabilities" of the firm.

44

### (6)    Accruals of Liabilities Owed to GMG

The Trustee contended that GMG also was entitled to receive percentage shares of the net revenues generated by the group.  However, during 2009 DA Partners allegedly did not record accruals for these liabilities in the same months during which it recorded commission revenues in its general ledger.  After January 1, 2010 DA Partners did not accrue for these liabilities at all. As a result (the Trustee contends) liabilities existed that were not properly reflected in DA Partners' financial reports.

In addition, the GMG share of the net revenues generated by GMG was $15 million for the calendar year 2009.  Of that amount, $5 million was not paid to GMG.  There was considerable dispute at trial over whether that unpaid $5 million should be treated as an outstanding debt or as a capital contribution made by GMG, or as a capital contribution by an entity owned by De Meneses and other GMG officers that was referred to as either "Forthco" or "Fourthco" in various exhibits.  The Trustee took the position that no capital contribution had ever been made, and that DA Partners should have carried a liability on its books for the unpaid $5 million (the balance of which declined somewhat over time).  Just what the balance actually might have been from time to time is not clear, as Ryniker and Costich offered figures that differed.  *See* Exhibit B.

The proposed adjustments for amounts owed to GMG – like the proposed adjustments for liabilities to foreign finders and foreign associates – reflect a fundamental inconsistency in the Trustee's contentions.  On the one hand, as explained above, the Trustee alleges that the GMG bribery scheme was so toxic that DA Partners should be treated as though it had completely lost the ability to generate ongoing revenues.  On that basis the Trustee argues that the value of the firm's assets should be measured each month just as though the bribery scheme had become

known and the firm's death had been realized.  On the other hand, the Trustee wants to measure

the firm's liabilities as though the criminal wrongdoers' purported shares in the profits of the

enterprise were perfectly legitimate and were due and owing.  But if the bribery scheme had been

revealed, and if it had brought about the death of the firm (which is the basis on which Costich

has proposed to calculate the value of the firm's business and assets), then surely nobody would

have treated the amounts that purportedly were owed to GMG as legitimate debts of the firm.

The Trustee did not contend that the amounts purportedly owed to GMG should be

treated as legitimate claims in the DA Partners bankruptcy case.  To the contrary: in this

adversary proceeding the Trustee seeks to recover the share of GMG "profit" distributions that

De Meneses received and argues (among other things) that GMG and De Meneses provided no

real consideration in exchange for those payments.  The Trustee's own claims against De

Meneses undermine his contention that amounts "owed" to GMG should be counted as true

liabilities of the firm in calculating the firm's solvency on a liquidation basis.

In addition, the evidentiary record as to the $5 million that was earned but not paid in

2009, and as to "profit sharing" amounts that were earned after December 2009, did not support

the adjustments that the Trustee's witnesses proposed – though in all candor the record on these

subjects was incomplete, in ways that the Court found to be very frustrating.

Craig testified that he understood that at the end of 2009 Chinea and the GMG employees

had decided that $5 million of the GMG profit participation from 2009 would be left in the

business as a "capital contribution," but that the arrangement was never finally documented.  De

Meneses testified that a letter of intent reflecting a capital contribution was negotiated in 2009

and executed in 2010, but his testimony was vague.  Remarkably, De Meneses testified that he

had a copy of the letter of intent, and during his testimony he gave copies to counsel to the

Trustee and counsel to Craig.  The attorneys for the Trustee and Craig stated that they had not

previously been aware of the document and that they wished to review it further.  That was the

last mention of the letter of intent at trial, as no party offered it into evidence.

Nevertheless, the exhibits that were offered at trial confirm that some kind of capital

contribution was contemplated and was reflected on tax filings.  For example, Craig's

spreadsheet that tracked the revenues and expenses of the GMG group noted that GMG's 60%

share of net profits for 2009 was $15,055,285; that $5 million was to be credited to a "capital

account;" and that a balance of $10,055,285 would remain for the "Forthco K-1."  *See* Exhibit S

to the Expert Report of Bernard Costich, CPA.  That same page of the spreadsheet refers to the

GMG share as an item to be reported on a Forthco 2009 Form K-1 for "Class C."  Costich

acknowledged that a Form K-1 would only be issued for someone who is an owner, and in these

respects the spreadsheet provides some verification for the contention that a capital contribution

was intended.  Craig testified that in fact DA Group issued a Form K-1 to Forthco.  However, no

copy of such a Form K-1 was offered into evidence.

Defendant's exhibit 26, which is an email dated April 2, 2010, includes an attachment

that describes the "K1 breakdown" that Chinea sent to the bookkeepers.  The attachment shows

that Chinea wished to issue K-1s to the following "DAG Partners" in the following amounts:

| DAG Partners | K1 | Capital Acct. |
|---|---|---|
| Forthco. | $7,488,106 | $5,000,000 |
| R. Kessler | $    65,326 | $    - |
| MC Holding | $  181,002 | $2,000,000 |
| N. Feinberg | $    39,000 | $  358,125 |
| Headwaters | $  600,000 | $    - |

Other evidence at trial made clear that Headwaters and MC Holding invested capital in DA Group,

not DA Partners, and to the extent they received Forms K-1 they did so as investors in DA Group.

47

The exhibits at trial also included a copy of the Form K-1 that DA Group issued to Headwaters for the year 2009, in the amount of $600,000.  *See* Craig Exhibit A (often referred to as Craig Exhibit 60 during the trial, as that was the number given to it during discovery.)  The foregoing materials therefore indicate not only that a capital investment was contemplated by Forthco, but also that the investment likely would have been at the DA Group level (not at the DA Partners level).

A capital investment at DA Group (not at DA Partners) would have been consistent with the investments made by MC Holding and Headwaters.  The evidence showed that MC Holdings and Headwaters owned an unspecified class or classes of membership interests in DA Group that entitled them to receive distributions that were calculated by reference to the revenues that were generated by various business units of DA Partners and thereafter distributed to DA Group.  Craig testified, for example, that MC Holdings held membership interests in DA Group that gave it rights to receive amounts calculated by reference to the revenues generated by the "soft dollar" business. Ungar testified that Headwaters acquired membership interests in DA Group that entitled Headwaters to amounts calculated by reference to the operating results of "the South American business."  The Trustee stipulated at trial that although the Headwaters interests referred to the results of operations of a business unit of DA Partners, the actual investment was with DA Group. The way that these particular investments worked is fully consistent with the notion that GMG's revenue participation was to be accomplished through membership interests in DA Group (even though its payouts were to be measured by the results of operations of a unit of DA Partners), and that the GMG "capital contribution" was to be through DA Group.

Plaintiff's exhibit 26, which is an email dated April 13, 2010, also refers to the issuance of a Form K-1.  In that email, Chinea informed De Meneses that "[w]ith respect to the 5 million in capital account the accountant was not comfortable with my idea of journaling it because if

you remember it was actually 2010 earnings based on some accruals being reversed.  Could set a flag off so better to let sleeping dogs lie."  De Meneses could not explain this language.  Neither Chinea nor any contemporaneous "accountant" testified at trial, and no other evidence was offered as to just what this meant.  Not did anyone explain just how Chinea had sought to "journal" the capital contribution, or even the entity (DA Group or DA Partners) as to which the capital contribution was to be recorded.  However, this exhibit does again bolster the contention that the $5 million was retained with the notion that it would constitute a capital contribution of some kind, as the email referred to a "2009 K1" that was to show $4,488,106 "earned income in cap account."  Costich and Ryniker confirmed that DA Partners never issued K-1 forms to GMG or its members, but as noted above Craig testified that DA Group did so.

Other evidence further suggests that while the ultimate purpose of the arrangement was to increase the capital of DA Partners, the parties contemplated that the members of GMG would acquire ownership interests in DA Group (not DA Partners).  For example, plaintiff's exhibit 21 verifies that the parties were continuing to have discussions in 2011 over the terms of a capital contribution.  The exhibit verifies that the parties contemplated that additional "Class A" capital contributions would be made to DA Group and then would be used by DA Group to provide capital to DA Partners.  The same exhibit refers explicitly to the unpaid balance of the prior GMG profit participation (though it refers to this as a "2010" item) and shows that the parties contemplated that $2 million of this sum would "be used to capitalize Class A shares" and that the remainder "will go into Class C shares for profit participation . . .".  This language suggests that the discussions between the parties contemplated that GMG's right to share in the net profits of the GMG business would take the form of payments to be made by DA Group with respect to Class C membership interests.

49

Plaintiff's exhibit 23 shows that De Meneses later asked for payouts of what was owed to

him with the exception of $500,000 that he had personally agreed to commit as "Class A"

capital.  De Meneses stated that he and other GMG members had "$5-6 million of capital in the

firm" as of August 2011.  The same exhibit includes an email that questions whether De

Meneses would likely "get any type of Class 'C' p&l benefit for 2011."  It stated an intent to

leave some money in the firm as "Class 'A' Capitalization" and suggested a repayment of his

portion of the initial GMG retention along with the benefit of a tax loss pass-through "from

DAG."  There could only be a tax loss pass-through by DA Group if the relevant obligations

were at that time regarded by the parties as obligations of DA Group, not DA Partners.

All of this could (and probably should) have been the subject of clearer evidence at trial.

The arrangements were negotiated by Chinea (on behalf of DA Group and DA Partners) and

Lujan (a GMG executive).  Neither of them testified at trial.  De Meneses and Craig testified, but

they did not negotiate the arrangements.  De Meneses and Craig also offered testimony that was

inconsistent, and that was clouded by a frequent sloppiness in distinguishing between DA

Partners and DA Group.

For example, when De Meneses was asked to explain why DA Group had issued a check

to him in 2013, he answered that "we had monies in Direct Access – and I don't – Group,

Partners, I don't – somewhere in there."  *See* 2/14/18 Tr. at 33.  A few moments later, when

asked whether he had ever been an equity owner in Direct Access Group, De Meneses answered

that "[t]here was an intent that we wanted to be at some point" and that "technically, no, but the

intent was that there was – there were – there was the intent back from a long time ago that there

was."  *Id.* at 34.  He confirmed that the intent was that the GMG members would acquire an

ownership interest, that they had left monies "for the benefit of the firm" with this intent, and

50

that they had tried to work out the details afterwards with Chinea.  *Id.*  at 42-43.  When asked

about his desire to get a repayment of certain amounts that had not been paid to him in 2009, he

denied that he regarded these as debts and testified that these were "payments of capital" that he

wanted to get back.  *Id*. at 57.  When he was then asked whether he had made a capital

investment in DA Partners, he testified that he was not clear as to whether the parties intended to

make a capital investment in DA Group or in DA Partners.  *Id.* at 59-60.  He also testified that in

2013 the parties contemplated unwinding their arrangement by an option sale agreement with

DA Group under which GMG would resell (to DA Group) an earlier option to acquire equity.

*Id.* at 88-89.  There was other testimony that suggested that such an option agreement might

actually have been signed in 2013.  Certainly, its terms (either in draft form or in the form of a

signed agreement) might have shed light on how the parties regarded these obligations.

However, no draft or signed copy of an Option Sale Agreement was offered in evidence.

Craig and his counsel also offered inconsistent descriptions of the arrangement.  During

portions of the trial (including his opening statement and his questioning of Ryniker) Craig's

counsel referred to the alleged capital contribution as a contribution directly to DA Partners in

exchange for a proposed ownership interest in DA Partners.  Later during the trial, however

(during the testimony of Craig), Craig's counsel elicited testimony that K-1 forms had been

issued to Forthco by DA Group – although, as noted above, copies of the K-1 forms were not

offered in evidence.  Craig also confirmed during his testimony that the other parties on Chinea's

proposed list of K-1 distributions were capital investors in DA Group, not DA Partners, and that

the list was intended to represent a list of parties who would receive K-1s from DA Group.

The Trustee offered into evidence copies of prior deposition testimony by Craig; that

testimony similarly was inconsistent as to how the arrangements worked.  At one point, Craig

testified that payments to Forthco "should always have been paid out of Direct Access Group" and that "they would have owned a piece of Direct Access Group, not the broker-dealer." *See* Plaintiff's Exhibit 115-1 at 126-127. Almost immediately thereafter, however, he also testified that he thought that GMG's 60% share of net revenues should have been paid by DA Partners and not by DA Group. *Id.* at 128-130. Then, under additional questioning, Craig confirmed that his understanding was that the money that GMG had left behind as "capital" was for the acquisition of an interest in DA Group. *Id* at 150.

At trial, the Trustee elicited testimony by Craig that the money left behind as "capital" ended up in a DA Partners account at Citibank for use by DA Partners. However, the structure of the arrangement with other investors in DA Group was that capital would be contributed to DA Group with the intent and understanding that DA Group, in turn, would contribute capital to DA Partners. The fact that the funds left behind as GMG "capital" ultimately were available to DA Partners is exactly what one would have expected if GMG had made a capital investment in DA Group and if that capital investment had been structured the way that other investors' contributions were structured.

Costich confirmed that on tax filings DA Group was always listed as the 99% owner of DA Partners and that neither Forthco nor GMG was ever listed as an owner of DA Partners itself. However, no financial statements, general ledgers or tax records of DA Group were offered in evidence. Costich and Ryniker had access to the DA Group records, but there is no evidence that they searched the general ledgers of DA Group, or tax filings by DA Group, to determine if there were any entries in those records that might shed light on the nature of the arrangements with GMG after January 1, 2010. The bookkeeper for DA Group and DA Partners also did not testify at trial, so her understanding of how the relevant items were recorded (if they were recorded at

all) is unknown.  Similarly, the outside auditors did not testify at trial.  The entire arrangement was the result of negotiations between Chinea and Lujan, but as noted above no testimony by Chinea or Lujan was offered, and no other evidence was offered as to what they actually agreed.

It appears that the parties never formally documented the terms of a capital investment by GMG – or at least no such documentation was offered into evidence.  Costich and Ryniker testified that an obligation that was owed by DA Partners should not have been converted to "capital" unless and until an agreement was signed, but that begs the question of whether the parties had agreed to convert any obligation owed by DA Partners to an obligation owed by DA Group pending the negotiation of the terms of a capital investment in DA Group.  Since the entire obligation to GMG is based on nothing but an informal oral discussion (the details of which are unknown to the Court), there is no reason why such a change to the arrangement could not have occurred through a similar undocumented oral discussion.

Most of the exhibits indicate that the parties understood that the unpaid balance of the 2009 earnings was owed by DA Group, not DA Partners.  In fact, the undisputed accounting evidence is consistent with the notion that all amounts to be paid to GMG after November 2009 were to be payable by DA Group, not DA Partners.  Exhibit B to Costich's report shows that the general ledger of DA Partners did include some accruals for payments to GMG early in 2009 (though perhaps not timely accruals), but that there were no accruals on DA Partners' general ledger for such amounts at any time after mid-2009.  Ryniker testified that all amounts that were paid to Forthco based on the 2009 earnings (including a payment that was made in December 2009) were paid by DA Group, not by DA Partners.  Costich's report confirms that all payments that were made to GMG from December 2009 forward were paid by DA Group.  Ryniker and Costich criticized this practice on the theory that it was somehow intended to disguise a liability

53

that was still owed by DA Partners to GMG. However, the notion that the amounts were still owed by DA Partners (and not by DA Group) was just an assumption on their part.

Evidence as to how DA Group's payments were treated on DA Group's own books and records and tax filings might have been extremely probative, but no evidence was offered as to what DA Group's records showed. Nevertheless, the more likely and more reasonable conclusion, based on the evidence that actually was offered and the fact that all actual payments to GMG were made by DA Group and not by DA Partners after November 2009, is that the parties had agreed that any profit participations payable to GMG and/or its members after 2009 were to be paid by DA Group (not DA Partners) – an arrangement that was similar to the arrangements with other investors in DA Group. The most plausible explanation of why DA Partners no longer reflected these sums on its own accounting records after January 2010 is that the parties no longer regarded them as obligations of DA Partners.

The Court cannot help but feel that better evidence could have been offered to clarify just how the relevant obligations were structured and how (if at all) those obligations changed over time. After considering all of the evidence that was offered, however, the Court concludes from the evidence that any profit participations payable to GMG after November 2009 (including amounts that were earned in 2009 but not actually paid to GMG at the end of 2009) were obligations of DA Group and should not be considered to be liabilities of DA Partners.

### (7)    Alleged Loans by DA Group to DA Partners

In December 2011 Lake Avenue Capital agreed to lend $2.5 million to DA Group, with the intent that the proceeds would be transferred to DA Partners. At some point after 2013 the auditors of DA Partners concluded that the amounts received from Lake Avenue Capital should be treated as a debt owed by DA Partners itself. Costich testified that he had reviewed the

transaction documents, that the documents reflected a transaction solely between Lake Avenue Capital and DA Group, and that there was no basis to treat DA Partners as the recipient of a loan from Lake Avenue Capital. This testimony was credible and was not disputed and the Court accepts it as correct.

However, Costich also testified that a portion of the $2.5 million loan (approximately $1.3 million) was transferred by DA Group to DA Partners. Costich elected to treat this transfer as a loan by DA Group rather than a contribution of capital. When asked, however, he acknowledged that no loan agreement existed, and he further acknowledged that the transfer had never been reflected on the books and records of DA Partners as a loan.

The evidence showed that DA Group intended to raise money from Lake Avenue Capital and then to contribute the funds to DA Partners as additional capital. No evidence was offered to support Costich's speculation that the transfer of a portion of the funds somehow represented a "loan" rather than the capital contribution that was intended. The Court therefore rejects Costich's contention that the $1.3 million that was provided by DA Group to DA Partners in 2010 should be treated as a debt rather than a contribution of capital.

*          *          *

If the foregoing adjustments are disregarded, then Costich's own calculations show that DA Partners was solvent at the time of all of the challenged transfers.

## V.     The Evidence Showed That DA Partners Had Sufficient Capital at the Time of the Challenged Transfers

In order to recover transfers pursuant to DCL § 274 and/or Bankruptcy Code § 548(a)(1)(B)(ii)(II) the Trustee must show that, at the time of the transfers, DA Partners was engaged in or about to engage in a business or a transaction that would leave it with unreasonably small capital. *Tese-Milner v. Edidin & Assocs,* 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013). This test

55

denotes a financial condition short of actual insolvency and "is aimed at transfers that leave the transferor technically solvent but doomed to fail." *Id.* (citing *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*), 910 F. Supp. 913, 944 (S.D.N.Y. 1995). In this regard, a debtor has "unreasonably small" assets if insolvency was inevitable in the reasonably foreseeable future. *Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Communs. Corp.)*, 652 F. App'x 19, 22 (2d Cir. 2016). Factors that may be relevant in determining whether capital was unreasonably small include the transferor's debt to equity ratio, its historical capital cushion, and the need for working capital in the transferor's industry. *See Official Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp., Inc. (In re Vivaro Corp.)*, 524 B.R. 536, 551 (Bankr. S.D.N.Y. 2015); *In re Taubman*, 160 B.R. 964, 986 (Bankr. S.D.Ohio 1993).

No presumptions are applicable with respect to the Trustee's claims that DA Partners had "unreasonably small capital;" it is the Trustee's burden to prove such contentions. *See In re Vivaro Corp.*, 524 B.R. at 551 ("By contrast, no such presumption exists for NYDCL section 274 claims."). The fact that a business actually survived for a considerable period of time after a challenged transfer is a factor that a court may consider in deciding whether the business had unreasonably low capital at the time of the transfer. *See Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d 1056, 1074 (3d Cir. 1992); *Daley v. J.F. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill 2002). However, it is only one of many factors that may be relevant, and is not necessarily controlling. *Tronox, Inc. v. Kerr McGee Corp. (In re Tronox, Inc.)*, 503 B.R. 239, 322 (Bankr. S.D.N.Y. 2013).

At trial, the Trustee challenged the accuracy of the monthly "net capital" computations that DA Partners made for SEC regulatory purposes. Ryniker testified that if certain liabilities had been recorded correctly, DA Partners in fact would have been out of compliance with the

SEC's net capital requirements at various times.  However, the regulatory "net capital" requirements imposed by the SEC are not the same as the "unreasonably small capital" standards that are relevant under section 274 of the DCL and section 548 of the Bankruptcy Code.  The SEC's net capital rules are regulatory requirements that focus on the assets that a broker-dealer would have if it had a sudden need to liquidate.  By contrast, the capital test that is relevant for purposes of section 275 of the DCL, and section 548 of the Bankruptcy Code, is whether a business will likely have sufficient capital to pay its ongoing obligations when all sources of revenue are considered – including revenues from ongoing operations, planned infusions of equity capital, or other sources.  *See Adelphia*, 652 F. App'x at 22 (in considering whether capital is unreasonably small courts must consider "all reasonably anticipated sources of operating funds," including new equity infusions, cash from operations, or cash from secured or unsecured loans).

In calculating whether a firm has "unreasonably small capital" one does not assume that a liquidation must occur.  Instead, the revenues that likely will be generated by the continuing business must be considered in deciding whether the business has unreasonably small capital.  *See Jackson v. Jackson (In re Jackson)*, 459 F.3d 117, 123 (1st Cir. 2006) (holding that under New Hampshire's "unreasonably small assets" statute a court should consider the debtor's ability to "generate enough cash from operations and sales of assets to pay its debts and remain financially stable" after a challenged transfer); *Moody*, 971 F.2d at 1070 ("unreasonably small capital" is a situation marked by "the inability to general sufficient profits to sustain operations"); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 137 (Bankr. D.Mass.1989) (Courts look "to the ability of the debtor to generate enough cash from operations or asset sales to pay its debts and still sustain itself."))  If a shutdown is likely and imminent, then

57

liquidation values may be a proper way to calculate a firm's capital. Otherwise, however, the assessment of whether a business has "reasonable" capital depends not only on the assets it could liquidate, but also on the revenues the business is expected to generate.

Here (as was the case with the Trustee's solvency contentions) the gist of the Trustee's argument is that DA Partners had no future from the moment the first bribe was paid by GMG, and that the firm's liquidation value therefore should be the only test of the adequacy of its capital. That is not a reasonable proposition, for the reasons already explained above. For the reasons stated above, the earliest point at which the firm's future was so uncertain that its solvency (or its likely future solvency) could reasonably be calculated on a immediate liquidation basis was July 2011. Furthermore, the evidence did not show that DA Partners actually was insolvent at any time prior to March 2013, let alone that its insolvency was "imminent" before that time.

Ryniker's calculations were offered for other purposes, too. For example, Costich relied on them in arguing that DA Partners was not in compliance with net capital requirements and therefore would not have been a good acquisition candidate. But there were several problems with the "net capital" calculations that Ryniker offered that, in the Court's view, prevent those calculations from being accepted.

First, the Court has found it impossible to square Ryniker's conclusions with other undisputed evidence as to the profitability of the firm and its various business lines. Ryniker contends (as did Costich) that liabilities to foreign finders, foreign associates and the GMG group (for profit sharing) should be added to DA Partners' financial statements. As explained above, however, nothing was owed to GMG for a given month unless the revenues for that month exceeded all of the expenses of the GMG business, including the amounts owed to foreign finders and foreign associates. Furthermore, no profit "sharing" could be owed to GMG unless

DA Partners itself also realized a profit for the relevant month from the GMG business.

Mathematically, the purported "liabilities" for GMG could not have been incurred in a given

month unless DA Partners actually realized revenues for that same month that substantially

exceeded all of the expenses as well as GMG's profit "share," thereby resulting in a profit share

for DA Partners as well.  Yet Ryniker's calculations purport to show that as the GMG business

grew, and as GMG's profit share grew, the "liabilities" to foreign finders, foreign associates and

GMG resulted in a *decline* in DA Partners' net capital, putting it into negative figures.

Ryniker's figures were presented as though a decline in DA Partners' capital was a

simple result of proper accounting and a proper alignment of revenue recognition and

expense/liability recording.  Mathematically, however, a profitable GMG business itself could

not by itself have resulted in a reduction in capital.  If GMG was entitled to a 60% profit share

for a given month, then that had to mean that all GMG expenses for that month (including

amounts owed to foreign finders and foreign associates) were fully covered by that month's

GMG revenues, and also that there had to be a 40% net profit balance to which DA Partners was

entitled.  That DA Partners' share of profits would have increased (not decreased) DA Partners'

capital.

As noted above, other factors unrelated to the GMG business itself might have led to a

decrease in capital notwithstanding the profitability of GMG itself.  The Court has reviewed and

re-reviewed the transcripts of the trial testimony and the exhibits to try to find such an

explanation, but it has found no answers.  Ryniker offered only his bottom-line calculations

without supporting details.  The suggestion that the GMG business could at the same time have

been extremely profitable in 2009, but that an accounting for its expenses and for GMG's partial

share of those profits somehow by itself resulted in a *decline* in DA Partners' available capital in

2009, simply made no sense.  The Court can only conclude that as an accounting matter there is

some imbalance or error in the calculations that Ryniker and his group prepared.  The evidence

was that the other parts of DA Partners' business were profitable, so in the absence of some other

explanation for the alleged declines in available capital the Court finds that the Ryniker

calculations are not credible or reliable.

Second, as noted above there were unexplained differences between the adjustments that

Costich proposed and the adjustments that Ryniker proposed.  They purported to use the same

records in coming up with their conclusions, and the differences just cast further doubts as to

their methodologies and as to the accuracy of their figures.

Third, the evidence showed that many of the adjustments that Ryniker proposed were not

proper.  More particularly:

- Ryniker added accruals for the "house reserves" to his net capital computations and

  deducted them as accrued liabilities for net capital purposes.  However, the evidence

  showed that these reserve accounts represented potential discretionary bonuses.

  Ryniker acknowledged under questioning that to the extent these represented

  potential "discretionary bonuses" they should not have been deducted in calculating

  net capital for SEC purposes.

- The evidence did not support the contention that DA Partners continued to owe

  money to GMG after November 30, 2009, or that liabilities for such amounts should

  have been included in the calculations of DA Partners' capital after November 30,

  2009, for the reasons stated above.

- Ryniker made additional adjustments to reflect amounts purportedly owed by DA

  Partners to DA Group.  He offered no explanation or justification for these

adjustments and no supporting information as to how they had been calculated.
Ryniker's adjustments in this category differed substantially from the adjustments
that Costich proposed for this same category.  As noted above, Costich improperly
assumed that DA Group had made a loan of $1.3 million to DA Partners in 2011; to
the extent Ryniker made the same assumption, it was an error to do so.  It also
appears that Ryniker treated payments by DA Group of certain obligations that
purportedly were owed by DA Partners as events that should be treated as loans by
DA Group to DA Partners, even though there was no evidence (and no
contemporaneous accounting) that showed that loans were intended.  More
importantly: subordinated liabilities to a parent company are not counted in
computing net capital.  The suggestion that the parties would have treated amounts
owing to DA Group as ordinary liabilities – even if doing so would have created a net
capital problem, and even if treating the same amounts as contributions of capital, or
as subordinated loans, would have avoided a net capital issue – makes no sense.

If Ryniker's calculations are adjusted just for the foregoing matters then his own
calculations show that DA Partners was in compliance with the SEC "net capital" rules throughout
the period beginning January 1, 2009 through December 31, 2012, with the possible exception of
one month (October 2010).  Even if the rest of the calculations were credible, then (a proposition
the Court is not prepared to accept), the only "net capital" issue that existed would have been a
temporary deficiency at the end of October 2010.  DA Group admittedly contributed $5 million of
additional capital in November and December 2010, so that even on that basis the deficiency was
immediately corrected.  No testimony was offered to support the notion that a temporary deficiency
could not have been addressed at the time through other measures, or that it would have required

a permanent closure of the business, or that it would have had any real consequence at all on the conduct of the business.

It is certainly not unthinkable that DA Partners' capital could have dwindled and have reached an unreasonably small level prior to the time when the firm actually fell apart in March 2013. But based on the evidence at trial the Court concludes that such a condition was not reached at the time of any of the challenged transfers.

## VI.    The Trustee Failed to Prove that Any Transfers Were Made with the Actual Intent to Hinder, Delay or Defraud Creditors

The parties agree that the Trustee has the burden of proving "actual intent" to hinder, delay or defraud present or future creditors under section 276 of the DCL. They further agree that as a matter of New York State law such actual intent must be proved by clear and convincing evidence. *See* Trustee's Pretrial Brief (ECF No. 74) at p. 17; Craig's Pretrial Brief (ECF No. 72) at 11. There is some difference of opinion in the case law as to whether a claim of "actual" fraudulent transfer under New York law requires proof of fraudulent intent on the part of the transferee as well as the transferor, but the better view is that the "intent" that is relevant is only the intent of the transferor, not the transferee. *See Gowan v. Patriot Group, LLC (In re Dreier)*, 452 B.R. 391, 432-33 (Bankr. S.D.N.Y. 2011).

The Trustee and Craig agree that the Trustee also has the burden of proving actual fraudulent intent under section 548 of the Bankruptcy Code. However, they note that there is a split in authority as to whether proof of actual fraud under section 548(a)(1)(A) is subject to a "clear and convincing evidence" standard or, instead, a "preponderance of the evidence" standard. *See Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 380 B.R. 325, 326 (Bankr. S.D.N.Y. 2008); *In re Dreier*, 452 B.R. at 423. Curiously, the Trustee and Craig each noted the difference

of opinion in their pretrial submissions, but without any further argument as to what they believed the proper standard should be. *See* Trustee Pretrial Br. at 10; Craig Pretrial Br. at 11.

The Supreme Court held in *Grogan v. Garner*, 498 U.S. 279 (1991), that a claim that a debt is exempt from discharge because it was the product of fraud is subject to a "preponderance of the evidence" standard. The Supreme Court identified numerous instances in which Congress had authorized the filing of fraud claims under a "preponderance" standard, *id.* at 289-90, and refused to apply a more stringent standard of proof in the absence of a clear indication, in the Bankruptcy Code, that a higher burden was applicable. This was true despite the fact that a higher standard or proof normally would have applied under state law. *Id.*

Here, too, Congress has created a remedy (section 548(a)(1)(A)) that references intentional fraud but that is not dependent on state law, and that does not include any expression of Congressional intent to apply anything other than a "preponderance of the evidence" standard of proof. The Court therefore holds that although the Trustee's claims of intentional fraudulent conveyance under New York State law are subject to a "clear and convincing evidence" standard, the few claims that the Trustee has made under section 548(a)(1)(A) of the Bankruptcy Code are subject to a less stringent "preponderance of the evidence" standard. *Accord, e.g.*, *Crawford v. Zambrano (In re Zambrano Corp.)*, 478 B.R. 670, 690 (Bankr. W.D.Penn. 2012) (applying "preponderance of the evidence" standard to section 548(a)(1)(A) claim); *Silagy v. Gagnon (In re Gabor)*, 280 B.R. 149, 155 (Bankr. N.D.Ohio 2002) (same).

The standard of proof ultimately does not matter in this case, however, because the Trustee's evidence failed to show an actual intent to hinder, delay or defraud creditors, no matter what standard is applied.

### A.    The So-Called "Ponzi Scheme Presumption" Is Not Applicable

Prior to trial, the Trustee took the position that the so-called "Ponzi scheme presumption" should be applied.  Under that presumption, in cases involving Ponzi schemes, "an actual intent to defraud is presumed because the transfers made in the course of a Ponzi Scheme could have been for no other purpose than to hinder, delay, or defraud creditors."  *In re Dreier*, 452 B.R. at 424. The Trustee argued that the mere fact that DA Partners derived funds from a criminal bribery scheme somehow established an intent not only to commit the crime of bribery, but also an intent that creditors of DA Partners would be defrauded.

However, the so-called Ponzi scheme presumption is based on the peculiar characteristics of a Ponzi scheme, under which every payment made to one investor is necessarily part of the scheme to defraud a new investor, and necessarily part of a scheme that ultimately will leave someone unpaid.  As the court explained in *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 306 n. 19 (S.D.N.Y. 2010):

> The logic for applying a presumption of actual intent to defraud in the Ponzi scheme scenario is tied to the fact that a Ponzi scheme 'cannot work forever.' When the pool of investors runs dry – as it will – the operator knows that the scheme will collapse and that those still invested in the enterprise will lose their money.  'Knowledge to a substantial certainty constitutes intent in the eyes of the law,' and awareness that some investors will not be paid is sufficient to establish actual intent to defraud.

By contrast, the mere fact that a business engages in some other form of illegal activity (even if substantial in amount) does not automatically mean that the business inevitably will fail or that creditors will be left unpaid.  Accordingly, illegal activity, standing alone, does not support a presumption that payments made by a business are made with an actual intent to hinder, delay or defraud the creditors of the business.  *See Sharp Int'l v. State Street Bank and Trust Company (In re Sharp Int'l)*, 403 F.3d 43, 56 (2d Cir. 2005) (noting that allegations that a party obtained

money by fraud were not sufficient to show that payments to other parties were made with fraudulent intent, because the "fraud alleged in the complaint relates to the manner in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of the proceeds to State Street"); *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1510 (1st Cir. 1987) (holding that dishonesty in the acquisition of funds is not sufficient and that fraudulent conveyance law "is basically concerned with *transfers* that 'hinder, delay or defraud' creditors and not the manner in which funds were obtained); *cf. Stoebner v. Opportunity Fin., LLC*, 562 B.R. 368, 386 (D. Minn. 2016), *aff'd*, 909 F.3d 219 (8th Cir. 2018) (affirming Bankruptcy Court's dismissal of actual fraudulent conveyance claims since "even while a Ponzi scheme was underway in other parts of [the debtor's principal's] empire, the actual deals pleaded by the Trustee here gave [the debtor] a legitimate source of earnings with which to pay [the transferees], on debt that had been taken on to finance real deals"); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Tech. Ltd.*), 337 B.R. 791, 810 (Bankr. S.D.N.Y. 2005); (refusing to hold transferee liable on actual fraudulent conveyance claim despite allegations that transferor engaged in fraudulent activity by inflating accounts receivable and inventory and that transferee likewise perpetrated a fraud*); In re Palladino v. Sacred Heart University*, 556 B.R. 10, 14 (Bankr. D. Mass. 2016) (Ponzi scheme presumption did not apply to transfers of tuition money by known Ponzi schemers to daughter's university because the transfers were not made "with actual intent to defraud their creditors" notwithstanding guilty pleas on investment fraud).   Criminal behavior in raising funds or in operating a business, while reprehensible, does not warrant a fraudulent conveyance claim unless the perpetrators of the crime intended that transfers of funds by the business would hinder, delay or defraud creditors, or at least knew that the inevitable and unavoidable effect of such transfers would be to leave creditors unpaid.

65

Perhaps recognizing these flaws in its argument, the Trustee later abandoned his arguments about the Ponzi scheme presumption at trial. Instead, the Trustee argued that certain evidence directly showed an intent to hinder, delay or defraud creditors, or alternatively that there were "badges of fraud" from which an actual intent to defraud creditors could be inferred. *See* Trustee's Post-Trial Brief (ECF No. 91) at pages 3-11 (arguing that intent had been proved through badges or fraud and not mentioning the Ponzi scheme presumption).

### B.    There Was No Direct Proof of Any Intent by DA Partners to Hinder, Delay or Defraud Its Creditors

The Trustee offered no direct evidence of DA Partners' alleged intent to defraud creditors. Craig was the only one of the persons who had authority to authorize the transfers and who testified at trial, and he credibly denied any intent to hinder, delay or defraud any creditors when the transfers were made. Craig testified that he personally prepared the profit and loss spreadsheets for each of DA Partners' subdivisions, and that he believed at the times of the challenged payments that DA Partners was in sound financial condition and capable of making these transfers without hindering, delaying or defrauding creditors or investors. All of the information available to Craig, including FOCUS Reports and audited financial statements, reinforced his belief that the transfers to him were legitimate and not made to defraud creditors.

The parties stipulated that Chinea became aware of the bribery scheme in July 2011. The Court has treated that date as the earliest date when (in hindsight) one could argue that the firm ultimately would cease operations. In theory one might argue that payments after July 2011 were made with the actual intent to defraud creditors if Chinea actually knew, as of that date, that it was inevitable that the business would cease, and also knew that creditors would be left unpaid. But no such evidence was offered. Proof that Chinea knowingly engaged in criminal behavior is not sufficient to prove that Chinea (or anyone else) had an actual intent to defraud creditors, or that

Chinea actually knew or believed that the bribery scheme would affect the firm's ability to stay in business, or that he actually knew or believed that the scheme would affect creditors in any way.

Similarly, the evidence showed that one of the defendants (De Meneses) knew of the underlying bribery scheme and knew that the payments he received were the products of illegal activity. However, that is not enough to prove that DA Partners (or the persons running DA Partners) made payments to De Meneses with an actual intent to defraud DA Partners' creditors. Nor is it enough to show that De Meneses himself thought that the payments would have any effect on DA Partners' creditors.

No evidence was offered that would support a finding that any executive or employee of DA Partners acted with an actual intent to hinder, delay or defraud creditors. The exhibits confirm that the executives at DA Partners, and at GMG, all thought that business was booming and that DA Partners had struck it rich. There was not a hint of any intent to harm creditors in any way.

The Trustee alleges that DA Partners engaged in other questionable (and perhaps wrongful) conduct in its dealings with various parties. The problem is that none of these matters shows an intent to use transfers to hinder, delay or defraud creditors, which is the intent that the Trustee must prove.

For example, Craig admitted at trial that certain payments that were made by DA Partners to Craig, Pfeffer and Chinea in 2009 were intended to represent equity distributions to the three founders. However, those three individuals were not owners of DA Partners. If equity distributions were proper, then DA Partners first should have made payments to its owner (DA Group), and any further distributions by DA Group should then have been shared with all of DA Group's owners. Instead, DA Partners recorded the relevant payments to Craig, Pfeffer and Chinea as compensation payments to them that were routed through ADP, which processed

compensation payments on behalf of DA Partners.  The result was that some owners of DA Group (Craig, Chinea and Pfeffer) received a cash payment, while another owner of DA Group (Headwaters) did not receive cash, and ultimately only received an accounting adjustment to its capital balance.  This certainly raises questions as to just how forthright the owners of DA Group were in their dealings with other owners of DA Group.  However, it does not prove an intent by DA Partners to make transfers that would hinder, delay or defraud its own creditors.

The Trustee also argued that Chinea and others failed to tell Headwaters and MC Holdings about the GMG bribery arrangements when Headwaters and MC Holdings made additional investments in DA Group in 2010.  The gist of the Trustee's argument seems to be that if Headwaters and MC Holdings were defrauded that would somehow prove an intent to "defraud" creditors for purposes of fraudulent transfer law.  But this argument fails for three reasons.  First, even if the Trustee had proved that Headwaters and MC Holdings were defrauded into making additional investments, that would be a "fraud" that is different from the one that the Trustee is required to prove here.  In order to sustain his claims of intentional fraudulent transfer the Trustee must show that DA Partners intentionally made transfers to Craig and De Meneses with the intent that those transfers would hinder, delay or defraud DA Partners' creditors.  Put another way:  the Trustee's claims need to focus on the intent with which transfers were made, not the manner in which money was raised.

Second, Headwaters and MC Holdings were not creditors of DA Partners.  They dealt with DA Group, not DA Partners.  The testimony was that the money that DA Group raised from Headwaters and MC Holdings was contributed to DA Partners, where it actually increased the funds available for the satisfaction of DA Partners' own creditor claims.  There is nothing about

the evidence of the interactions with Headwaters and MC Holdings that suffices to show any fraudulent intent in connection with transfers that DA Partners made to De Meneses and to Craig.

Third, I find that in any event the evidence did not show that DA Partners committed any fraud, or intended to commit fraud, in its dealings with Headwaters and MC Holdings. The Trustee argues that Headwaters and MC Holdings were not told about the bribery scheme in 2010. However, the Trustee stipulated that Chinea did not know of the bribery scheme until July 2011. For the reasons set forth below I find that Craig did not know of the bribery scheme until charges were filed in March 2013. Chinea and Craig could not have intentionally misled Headwaters and/or MC Holdings, or intentionally withheld information about the GMG bribery scheme, in 2010, because Chinea and Craig did not know of the scheme. Ungar testified that Chinea allegedly made oral misrepresentations as to the 2010 operating results for GMG, but Craig denied that this occurred, and I found Craig's testimony to be credible.

The Trustee also suggested throughout the trial that DA Partners was less than forthcoming with regulators, counterparties and others about the nature of the business with BANDES. For example, the Trustee contends that some clearing firms (JPM and Pershing) did not wish to clear transactions that DA Partners handled for BANDES and that this was a signal that the BANDES work might have been tainted. The evidence at trial was unclear, however, as to just what JPM and Pershing actually thought of BANDES, and was mixed as to why they did not wish to clear DA Partners' trades for BANDES. The evidence did show, however, that other reputable clearing firms were willing to clear the trades for DA Partners, including Goldman Sachs. The evidence about communications with Pershing and JPM fell far short of what the Trustee needed to prove in this case – which is that DA Partners made transfers with the intent to hinder, delay or defraud

its own creditors.  Merely intending to commit other wrongs (even if that had been proved) would not be enough.

Finally, the Trustee argued that for several months DA Partners booked certain "loan receivables" from members of the GMG group and that these represented a fraudulent accounting designed to mask the true reason for the payments that had been made to the GMG members.  The evidence did show that there was a false accounting and that for some time DA Partners' books showed "receivables" from GMG members that were fake, thereby overstating the firm's assets.  However, the entries were later reversed without any impact on creditors, and no evidence was offered to connect these particular accounting issues with any intentional scheme to make transfers that would hinder, delay or defraud other creditors.

### C.    The Alleged "Badges of Fraud" Did Not Establish an Intent to Hinder, Delay or Defraud Creditors

It is well-established that fraudulent intent may be established not only by direct proof, but also "by inference from the circumstances surrounding the allegedly fraudulent act."  *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 128, 508 N.Y.S.2d 17, 21-22 (2d Dep't 1986) (citing *Stewart v. Lyman*, 62 A.D. 182, 186, 70 N.Y.S. 936 (1st Dep't 1901); *United Parcel Serv. v. Norris Corp.*, 102 Misc.2d 231, 423 N.Y.S.2d 125 (Sup. Ct. 1979); *Matter of Gafco Inc. v. H.D.S. Mercantile Corp.*, 47 Misc.2d 661, 263 N.Y.S.2d 109 (Civ. Ct. N.Y. Cty. 1965).  "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."  *Sharp Int'l Corp. v. State St. Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (quoting *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247 (1st Dep't 1999)).  These "badges of fraud" may include, among other things:

70

- Inadequate consideration;

- A family, friendship or close associate relationship between the parties;

- The retention of possession, benefit or use of the property in question by the transferor;

- The financial condition (before and after the transaction) of the party sought to be charged with fraudulent intent;

- The existence or cumulative effect of a pattern or series of transactions;

- The general chronology of events and transactions under inquiry;

- A questionable transfer not in the usual course of business; and

- Secrecy, haste or unusualness of the transaction.

See *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Tech. Ltd.*), 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005); *see also United Parcel Serv.*, 102 Misc.2d at 233; *Gafco Inc.*, 47 Misc.2d at 664-65, 263 N.Y.S.2d at 114.

Of course, each alleged "badge of fraud" must be judged in the context of other evidence and in light of what reasonable implications can be drawn from it in a particular case. They are not items to be considered in a vacuum, as though the presence of one or more factors automatically shows a fraudulent intent. *See Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760, 769 (Bankr. S.D.N.Y. 2013) ("The presence or absence of one badge of fraud is not conclusive." (citing *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006). In this particular case I find, in the context of all the evidence, that the alleged badges of fraud do not suffice to show an actual intent to hinder, delay or defraud creditors.[7]

---

[7] The Court's conclusions that Craig received salary payments in "good faith," as explained below, also confirm that Craig himself did not authorize transfers with an actual intent to hinder, delay or defraud creditors.

Some of the challenged payments represented profit distributions, which by their nature are without consideration. A transfer without consideration may be a sign of fraudulent intent, at least to the extent (for example) that it is made when the transferor is aware that the transferor is in trouble with creditors, so as to support an inference that the transfer was made in order to put assets out of the reach of those creditors. But corporations and limited liability companies often make profit distributions – in fact, that is the very purpose for which business is conducted. The fact that a profit distribution is made is more likely to mean that the parties believe the transferor is fully solvent and that the business is doing well, rather than a sign of bad intent. Every dividend is made without consideration for purposes of fraudulent transfer law, but that does not mean that one could or should conclude that every dividend payment is made with fraudulent intent. In this case, the evidence showed that payments were made because the people who authorized them believed that the business had generated huge profits, and not because they believed there were financial problems or because they wanted to put assets out of the reach of creditors.

The Trustee claimed that certain profit distributions to Craig, Chinea and Pfeffer had been made by first having DA Partners make distributions to DA Group and then having DA Group make distributions to its owners. The Trustee argued that this was evidence of a scheme to conceal DA Partners' payments to insiders. But if profit distributions were being made this was actually the right way to make them, as the Trustee himself contended with respect to the 2009 payments that had been made through ADP.

There were close relationships between DA Partners, on the one hand, and Craig and De Meneses, on the other. While that is a factor that might support an inference of fraud in another case, it does not support that inference here. There is no indication in the evidence that DA Partners sought to do anything but to make salary payments to people who had earned them, or to transfer

72

shares of accumulated profits to persons who were entitled to them. The people who ran DA Partners did not act with an intent to favor insiders, or people with whom they had close relationships, at a time when they believed that DA Partners was in financial trouble. To the contrary: they made payments that they thought were justified by the profits that the business had generated and that they did not believe would affect creditors in any way.

As to the remaining badges of fraud that courts have identified in other cases:

- This is not a case where a transferor secretly retained control of transferred property (thereby suggesting that the transfer was merely a ruse for the purpose of deceiving creditors).

- The Trustee argued at trial that DA Partners' financial statements were incorrect, but the Court finds from the evidence that Craig and the other executives and employees of DA Partners did not have knowledge of financial problems or of errors in financial reports.

- The Trustee argues that the profit distributions that were made were much larger than any payments that DA Partners had ever made before, but that was perfectly consistent with the executives' belief that DA Partners was much more profitable after 2009 than it had ever been before.

- There is nothing about the chronology of the payments, or the circumstances under which they were made, or the timing of the payments, that in this particular case was sufficient to support a finding that there was an actual intent to hinder, delay or defraud creditors. The evidence showed only that the executives thought their ship had come in and that their business had been an enormous success.

For all of the foregoing reasons I find that the Trustee failed to prove his contentions that any transfers were made with an actual intent to hinder, delay or defraud creditors of DA Partners.

**VII.    The Trustee Failed to Show that Any of the Challenged Payments Were Made at a Time When DA Partners Intended to Incur, or Believed that It Would Incur, Debts that Would be Beyond DA Partners' Ability to Pay as They Matured**

Section 548(a)(1)(B)(ii)(III) permits the Trustee to recover three salary payments that were made to Craig (assuming that no other defenses to such claims exist) if the Trustee proves that they were made for less than a reasonably equivalent value and that DA Partners "intended to incur, or believed that [it] would incur, debts that would be beyond [its] ability to pay as such debts matured." *See* 11 U.S.C. § 548(a)(1)(B)(ii)(III).  Section 275 of the New York Debtor and Creditor Law provides for a similar claim.  In order to prove a claim under section 275 of the DCL, or under Section 548, the Trustee must show that the transferor (DA Partners) had an actual subjective belief that it would incur debts beyond its ability to pay as they matured. *See In re Best Prods. Co.*, 168 B.R. 35, 52 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir.1995); *see also Grace Plaza of Great Neck, Inc. v. Heitzler*, 2 A.D.3d 780, 781, 770 N.Y.S.2d 421, 423 (2003) (Pursuant to NY DCL § 275, a conveyance made by a person who has a "good indication of oncoming insolvency" is deemed to be fraudulent); *Kramer v. Chin (In re Louise Chin)*, 492 B.R. 117, 129 (E.D.N.Y. Bankr. 2013) (Feller, J.) ("Courts have interpreted 'intends or believes' as 'awareness by the transferor that, as result of the conveyance, he will not be able to pay present and future debts.'")

The Trustee has not presented any evidence to meet his burden on these claims.  The Trustee has not even identified the individual or individuals who allegedly had the "subjective belief" that DA Partners would be unable to pay its debts as they came due.  Craig himself did not have such a subjective belief.  The evidence at trial showed that Craig believed that DA Partners was doing well financially and that all payments that it made were well within its financial means.

DA Partners was current on its obligations and did not have major creditors. The Trustee criticized DA Partners' accounting and argued that a true accounting would have shown that DA Partners was insolvent or had inadequate capital, but as explained above many of the Trustee's contentions were unsound, and more importantly there was no evidence that anyone at DA Partners actually believed (or intended) that debts would be incurred that DA Partners would be unable to pay. Finally, the Trustee argued at times that Headwaters and MC Holdings were at risk of not being repaid, but Headwaters and MC Holdings were not creditors of DA Partners.

## VIII.    The Trustee Cannot Recover Any Salary Payments to Craig Because the Evidence Showed that Reasonable Value Was Provided and That Craig Acted in Good Faith

Some of the payments that were made to Craig by DA Partners were salary payments. The Court concludes that the salary payments were made for "value" and that they were received in good faith, and that the Trustee could not have recovered them even if the evidence had otherwise established the grounds for a fraudulent transfer or fraudulent conveyance claim.

Three of the salary payments arguably fall within the two-year reach of section 548(a) of the Bankruptcy Code. Even if the Trustee had been able to establish an intent to defraud creditors, the Trustee could not recover the salary payments if they were received by Craig in "good faith" and if Craig provided "value" for the payments. *See* 11 U.S.C. § 548(c). Similarly, even if the Trustee had been able to establish one of bases for a "constructive" fraudulent transfer claim, he could not recover the salary payments under section 548 unless the Craig failed to provide "a reasonably equivalent value" for such payments. 11 U.S.C. § 548(a)(1)(B)(i). Federal courts have usually treated "value" and "good faith" as affirmative defenses as to which a defendant bears the burden of proof by a preponderance of the evidence. *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC, (In re Bayou Grp.), LLC*, 439 B.R. 284, 308 09 (S.D.N.Y. 2010) (citing *In re Actrade Fin. Techs., Ltd.*, 337 B.R. at 805 (citing *Breeden v. L.I. Bridge Fund, LLC*

75

*(In re Bennett Funding Grp., Inc.)*, 232 B.R. 565, 573 (Bankr. N.D.N.Y. 1999) ("[Section 548(c)]

has been construed as an affirmative defense, all elements of which must be proven by the

defendant-transferee.")).

Other salary payments may only be recovered under sections 273 through 276 of the New

York Debtor and Creditor Law.  Some of those provisions (sections 273-275) only permit the

recovery of transfers that are made without "fair consideration."  DCL §§ 273-275.  "Fair

consideration" is provided for a property transfer, or for the incurrence of an obligation, under

the following circumstances:

> a.   When in exchange for such property, or obligation, as a fair
> equivalent therefor, and in good faith, property is conveyed or an antecedent
> debt is satisfied, or

> b.   When such property, or obligation is received in good faith to secure
> a present advance or antecedent debt in amount not disproportionately small
> as compared with the value of the property, or obligation obtained.

DCL § 272.  The definition of "fair consideration" under the New York Debtor and Creditor Law

therefore incorporates concepts of "value" as well as concepts of "good faith."  *In re Vivaro Corp.*,

524 B.R. 536, 500 (Bankr. S.D.N.Y. 2015) (citing *Estate of Rufffini v. Norton Law Grp., PLLC (In

re Ruffini)*, Adv. Proc. No. 12-8396, 2014 WL 714732, at *7 (Bankr. E.D.N.Y. Feb. 25, 2014).

"Fair consideration" does not require dollar-for-dollar equivalence.  Consideration can be "fair"

even if it is less than the value of the transferred property, so long as "it is an amount that is not

disproportionately small as compared to the value of the transferred property." *Lippe v. Bairnco

Corp.*, 249 F. Supp. 2d 357, 377 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (internal

quotation marks omitted); *Deflora Lake Dev. Assocs., Inc. v. Hyde Park*, No. 13-CV-4811, 2016

WL 7839191, at *3 (S.D.N.Y. June 9, 2016), aff'd, 689 F. App'x 93 (2d Cir. 2017), and aff'd, 689

F. App'x 99 (2d Cir. 2017).

A lack of "fair consideration" is an element of the Trustee's case under sections 273 through 275 of the NYDCL, as to which the Trustee bears the burden of proof by a preponderance of the evidence. *See Gowan v. Patriot Group, LLC (In re Dreier)*, 452 B.R. 391, 442-43 (Bankr. S.D.N.Y. 2011); *Deflora Lake Dev. Assocs., Inc. v. Hyde Park*, No. 13-CV-4811, 2016 WL 7839191, at *3 (S.D.N.Y. June 9, 2016) (the party challenging a conveyance under section 273 has to show insolvency and lack of fair consideration), *aff'd*, 689 F. App'x 93 (2d Cir. 2017), *and aff'd*, 689 F. App'x 99 (2d Cir. 2017) (quoting *Joslin v. Lopez*, 309 A.D.2d 837, 838 765 N.Y.S.2d 895, 897 (2d Dep't 2003)); *Atateks Foreign Trade Ltd. v. Dente*, No. 11-CV-01892, 2017 WL 4221085, at *5 (S.D.N.Y. Sept. 22, 2017) (elements of NY DCL Section 273 and 274 must be proved by the plaintiff); *Actrade*, 337 B.R. at 802 (under New York law, the party seeking to have the transfer set aside bears the burden of proof on the element of fair consideration and, since it is essential to a finding of fair consideration, good faith) (citing *United States v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994)).

In addition, under New York law a plaintiff may not recover a fraudulent conveyance from a "purchaser for fair consideration without knowledge of the fraud at the time of the purchase . . ." DCL § 278. This defense applies even if the Trustee contends that a transfer is intentionally fraudulent pursuant to section 276 of the New York Debtor and Creditor Law. Courts have held that the word "purchaser" in section 278 encompasses a creditor who provides fair consideration for a conveyance and who acts without knowledge of the fraud. *See Fed. Deposit Ins. Co. v. Malin*, 802 F.2d 12, 20 (2d Cir. 1986) (holding that a husband's obligation to support his wife is an antecedent debt that satisfies the definition of "fair value" and that the wife was a "purchaser" within the meaning of section 278); *City of New York v. Johnson*, 137 F.2d 163, 165 (2d Cir. 1943) (holding that an execution creditor is a "purchaser" within the meaning of section 278).

When a transferee defendant raises fair consideration as an element of his defense under section 278, the burden shifts and the transferee must carry his "affirmative burden of proof" on that defense. *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 451 (S.D.N.Y. 2014); *see also Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 331 (Bankr. S.D.N.Y. 2011) (noting that "[a]n innocent purchaser must affirmatively show good faith in order to take advantage of [NYDCL] section 278" (citations omitted)); *Mendelsohn v. Jacobowitz* (*In re Jacobs*), 394 B.R. 646, 659 (Bankr. E.D.N.Y. 2008) ("An innocent purchaser must affirmatively show good faith in order to take advantage of Section 278(2).").

Some cases also have held that the burden of proof as to fair consideration may also be shifted to a transferee if "the evidentiary facts as to the nature and value of the consideration are within the transferee's control." *McCombs*, 30 F.3d at 323-27. However, the Trustee has not argued that in this case the relevant evidence was in the control of the defendants, or that the burden of proof on the fair consideration issues should be shifted to the defendants.

The shifting allocations of the burden of proof under the foregoing standards can be confusing and could be a problem in cases where the evidence is uncertain and where the outcome depends on where the burden lies. Here, though, it does not matter how the burden of proof is allocated. The Court finds, based on all the evidence and by more than a preponderance of the evidence, that Craig received salary payments for fair value, in good faith, and without knowledge of any grounds on which they might be voided.

## A.    Value/Fair Equivalent

Craig's salary, from the time DA Partners was organized, was approximately $250,000 to $300,000. In 2009 Craig received a bi-weekly salary payment of $12,500. His salary did not increase after the GMG group joined DA Partners. For three months during the summer of 2010,

after DA Partners had hired a number of new employees, Craig and the other founders agreed to reduce their own salaries temporarily as a way of leaving additional capital in DA Partners. Craig's biweekly payments were reduced from $12,500 to $1,178, which was the minimum that had to be paid to cover benefits such as health care costs.

Craig testified credibly that his salary was not excessive and that he worked diligently throughout his time at DA Partners. The Trustee offered no evidence to suggest that the salary was out of line with the amounts paid to persons who had similar duties for similar brokerage firms. Nor did the Trustee suggest that Craig ever shirked his responsibilities, or that he failed to show up for work, or that his work was sub-standard in any way.

Payments of salary are generally presumed to be made for fair consideration, at least as a matter of New York law. *Jacobs v. Altorelli (In re Dewey & LeBoeuf LLP)*, 518 B.R. 766, 786 (Bankr. S.D.N.Y. 2014) (citing *Pryor v. Tiffen* (*In re TC Liquidations LLC*), 463 B.R. 257, 268 (Bankr. E.D.N.Y. 2011). The Trustee's counsel acknowledged this during closing argument, acknowledging that "every salary payment made is presumptively received in exchange for fair consideration," but arguing that the presumption is "rebuttable if the salary payments were made in bad faith or were excessive in light of employment responsibilities." As discussed below, the evidence here did not show that any of the salary payments to Craig were made (or received) in bad faith. Nor was there any evidence that the payments were "excessive" in light of Craig's position and duties.

Courts have held that employees have returned less than reasonably equivalent value if they fail to provide faithful service to their employers, and this can be true even if their salaries were otherwise commensurate with those of similarly situated faithful employees. *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 112-13 (Bankr. S.D.N.Y. 2011)

("[E]ven if the Defendants' wages were proportionate to the wages of senior management in legitimate enterprises . . . the Defendants returned less than reasonable equivalent value to BLMIS as a result of their alleged lack of faithful service."); *Carney v. Lopez*, 933 F. Supp. 2d 365, 382 (D. Conn. 2013) ("Furthermore, the complaint alleges millions of dollars of transfers to defendants in exchange for failed services and breaches of fiduciary duties, a de facto overpayment." (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. at 112-13)); *see also Halperin v. Moreno* (*In re Green Field Energy Servs., Inc.*), No. 13-12783 (KG), 2015 WL 5146161, at *14 (Bankr. D. Del. Aug. 31, 2015) (also citing *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. at 112-13, and, at pleading stage, inferring lack of fair consideration for compensation where plaintiff also alleged that transferee breached fiduciary duty and corporate waste). But the evidence in this case failed to show that Craig offered anything less than faithful service.

Accordingly, the Court finds based on the evidence at trial that the services provided by Craig constituted fair "value" and a "fair equivalent" for the full amounts of the salary payments that he received.

## B. Good Faith/Lack of Knowledge of Fraudulent Conveyance

The question of what "good faith" means, in the fraudulent transfer context, has bedeviled the courts. One could find support in the case law for just about every conceivable interpretation of the term.

Some courts and commentators have held that "good faith" is a subjective standard that focuses on the actual mindset of the transferee. *See, e.g.*, *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1512 (1st Cir. 1987); *Cohen v. Sutherland*, 257 F.2d 737, 742-43 (2d Cir. 1958) (construing section 67, sub. d(2) of the Bankruptcy Act and applying a subjective standard); *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, No. 13-CV-6437, 2016 WL 4290525, at *4

(S.D.N.Y. Aug. 11, 2016) (internal citations omitted), *aff'd*, 716 F. App'x 23 (2d Cir. 2017) (to show lack of good faith, the Trustee must prove that the transferee lacked an honest belief in the propriety of the activities in question; intended to take unconscionable advantage of others; or intended to hinder, delay, or defraud others, or knew that the activities in question would do so); *Meoli v. Huntington Nat'l Bank (In re Teleservices Grp., Inc.)*, 444 B.R. 767, 773 (Bankr. W.D. Mich. 2011); *Perkins v. Lehman Bros., Inc. (In re Int'l Mgmt. Assocs.), LLC*, 563 B.R. 393, 423 (Bankr. N.D. Ga. 2017); *Quinn v. Ingham (In re Gibco, Inc.)*, 185 F.R.D. 296 (D. Colo. 1997).

Other courts, however, have held that "good faith" is not a subjective test at all, but instead is an "objective" standard that is to be applied using not only the actual knowledge and information that a transferee had, but also the knowledge and information that a reasonably prudent person should have had under the circumstances. *See Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp.)*, 916 F.2d 528, 536 (9th Cir. 1990) (courts look to whether "a reasonable person" would have been put on notice of "a debtor's fraudulent purpose"); *Jobin v. McCay (In re M&L Bus. Mach. Co.)*, 84 F.3d 1330, 1338 (10th Cir. 1996) (applying an objective test and finding a lack of good faith if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 659 (M.D. Fla. 2002) (issue is whether "the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose" (quoting *In re Agric. Research & Tech. Grp.*, 916 F.2d at 536)); *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995) ("[C]ourts look to what the transferee objectively knew or should have known."); *Boyer v. Crown Stock Distrib.*, No. 1:06-CV-409, 2009 U.S. Dist. LEXIS 12393, at *41-42 (N.D. Ind. Feb. 17, 2009) (question is whether investors had "reason to know of the possibly fraudulent nature of the transaction that resulted in the distributions they received"); *In re Lull*, 386 B.R. 261, 271 (Bankr. D. Haw. 2008) (question is whether

transferee "knew nor should have known of the fraudulent nature of the transfer"); *Cadle Co. v. White*, No. 302CV00030, 2006 WL 798900, at *8-9 (D. Conn. March 21, 2006) (issue is whether transferee "knew or should have known of the transferor's fraudulent intent"); *Durkin v. Shields (In re Imperial Corp. of Am.)*, No. 92-1003, 1997 U.S. Dist. LEXIS 20943, at *13-14 (Aug. 12, 1997) ("[C]ourts generally consider whether the transferee objectively knew or should have known of the debtor/transferor's fraudulent purpose.").

Courts that have applied a "constructive knowledge "or 'objective" test have also differed as to just how that test is to be applied.  The Second Circuit Court of Appeals summarized these different approaches in *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d. Cir. 1995), observing that there was "some ambiguity" as to the precise test for constructive knowledge, as some courts had held that transferees who failed to make inquiry were charged with "the knowledge that ordinary diligence would have elicited," while others had "required a more active avoidance of the truth." *Id.* at 636.  Almost 25 years have passed since the *HBE* decision was issued, but the differences in approach persist.

Courts have not even agreed as to the role that a "duty of inquiry" plays in assessing good faith.  As noted above, some courts have charged transferees with the knowledge that a proper inquiry would have revealed.  But a number of other courts have held that the mere absence of a diligent investigation in the face of unusual circumstances is enough to negate "good faith" – regardless of whether a further investigation would have revealed anything.  *See In re World Vision Entm't, Inc.*, 275 B.R. at 660-61; *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 798 (Bankr. S.D. Fla. 2000) ("The mere failure to make inquiry in the face of unusual circumstances [] is sufficient to preclude a good faith defense").

There is ample room for disagreement as to what the standard ought to be. For example, it is difficult to think of a legal formulation that is more inherently subjective than that of "good faith." There are some statutes (the Uniform Commercial Code immediately comes to mind) that use "good faith" to connote what a reasonable person would believe and how a reasonable person would act. But there is no such definition of "good faith" in the Bankruptcy Code or in the New York Debtor and Creditor Law. The notion that "good faith" should be judged "objectively" in a fraudulent transfer case is the product of judicial rulings, not statutory definitions.

Fortunately, it is not necessary to untangle these very difficult questions as they relate to the Trustee's claims against Craig. Regardless of whether a "subjective" or an "objective" standard is applied, and regardless of what version of the "objective" test is applied, the evidence showed that Craig acted in good faith with respect to his receipt of salary payments.

As noted above, there was no direct evidence that Craig ever intended to hinder, delay or defraud creditors of DA Partners. Instead, the evidence was to the contrary. Craig believed that DA Partners was solvent, that its operations were profitable and that its prospects were bright. I found him to be credible on these points. The financial reports and financial statements that were provided to him all confirmed that DA Partners was a thriving business, not a failing one. He had no knowledge or belief that any salary payment he received represented a fraudulent conveyance by DA Partners.

Some of the Trustee's evidence and arguments focused on whether Craig knew or should have known of financial problems at DA Partners. For example, the Trustee argued that Craig was the nominal "chairman" of DA Partners, and further suggested that Craig functioned as the chief financial officer of the firm. The evidence showed otherwise. The "chairman" title was an empty one; all witnesses confirmed that the real chief executive functions were performed by Chinea. In

addition, Craig had no formal accounting trading, did not act as the book-keeper for DA Partners (another identified individual performed that function), did not keep or review the general ledgers, did not prepare or sign off on the monthly FOCUS reports, and did not prepare or sign off on the financial statements of DA Partners. From time to time Craig answered questions from auditors, but that is to be expected of any executive. Nothing about the inquiries Craig received from auditors, or his answers, showed that Craig knew or should have suspected that DA Partners was encountering any financial difficulties.

More importantly: for the reasons discussed above I find that the firm's actual financial condition was not nearly so bleak as the Trustee depicted it at trial. The Trustee acknowledged that the GMG business generated profits, and the uncontradicted testimony was that the other business units also were profitable. The Trustee failed to show that Craig believed (or should have believed) that DA Partners had financial problems, let alone that Craig intended to harm DA Partners' creditors, or that he believed (or should have believed) that anyone else at DA Partners had such an intent, or that payments of his salary would actually have the effect of harming creditors. The financial reports that Craig received depicted a firm that had enjoyed great success.

Craig prepared spreadsheets that tracked revenues and expenses for various practice groups, but those spreadsheets showed that the practice groups were generating profits. The Trustee's witnesses criticized the way that the spreadsheet information was reflected in the general ledgers of DA Partners and then in DA Partners' monthly financial statements, and more particularly in the timeliness of certain accruals of liabilities, but it was not Craig's job to prepare those financial statements or to determine the proper accrual timing under generally accepted accounting principles. Craig denied that he ever knew or believed, or should have known or believed, that there were any errors in the ways that DA Partners booked revenues and expenses,

and the evidence fully supported that testimony. The Trustee's criticisms were made after-the-fact, and there was no evidence that the bookkeeper for DA Partners, or its outside auditors, raised any issues about the accruals of revenues and expenses, or about any other accounting issue, prior to the collapse of the firm.

DA Partners booked certain "loan receivables" from members of the GMG Group, and these represented a false accounting that had the effect of overstating the firm's assets. However, the evidence did not show that Craig was responsible for the false accounting, or that he knew of the false accounting. More importantly, no evidence was offered as to why Craig should have believed that these particular accounting issues had any bearing on DA Partners' overall financial condition, or on DA Partners' ability to make payments to creditors, or on DA Partners' ability to continue as a going concern. The testimony by the Trustee's own witnesses makes clear that even if adjustments were made for these false receivables DA Partners nevertheless was solvent and in compliance with SEC net capital rules at all relevant times. (The Trustee's witnesses reached the opposite conclusions by making other adjustments that the Court has rejected.)

Most of the Trustee's arguments and evidence concerning Craig focused on the underlying bribery scheme and whether Craig knew or should have known of its existence. However, the evidence showed that Craig did not know of the bribery scheme and did not know of circumstances that he should have investigated further.

Craig knew that the GMG group was joining DA Partners and he knew that the relevant individuals had previously worked at another broker-dealer, Lighthouse Securities. Craig testified without contradiction, however, that all of the principals of GMG, as well as the foreign finders and foreign associates, were vetted by Gerard Visci and his compliance team at DA Partners. No explanation was offered as to why Craig allegedly should not have trusted the background checks

85

that the compliance team had done, and no evidence was offered that Craig himself participated in the checks or was aware of any deficiencies in them – or that there were any deficiencies.

Craig processed payments that were made to foreign finders and foreign associates and he plainly was aware that payments were made to Haydee Paybon, Iuri Bethancourt, ETC and others. Craig admits that he had questions about the new business and about the size of the payments going to these foreign finders. However, he testified that he was told by Chinea and others that these third parties were responsible for bringing in the BANDES business based on their relationships with BANDES. More importantly, Craig testified that he cleared all payments with Visci (the compliance officer), and the Trustee never disputed that Craig did so. Craig testified credibly that he trusted the compliance team and its processes.

Craig also was aware of the volume of the business that GMG received from BANDES. The Trustee argues that the extraordinary amount of commission revenues was itself a red flag signifying suspicious conduct. Although these revenues were historically large for DA Partners, to the best of Craig's knowledge they were consistent with revenues earned by other broker-dealers which executed orders in fixed income securities. It was obvious that DA Partners had landed a very large client, but that is the goal of every service business, and being successful in landing a large client is not by itself a sign of wrongdoing. Since the compliance personnel had reviewed and approved the business, there was nothing about the fact that DA Partners had landed a large client that was a "red flag" suggesting that something wrong had to be occurring.

The Trustee argues that ETC Investments was a Panamanian company that used a Swiss bank account, and that this should have alerted Craig that payments were not legitimate. It is true that Panamanian-incorporated businesses and secret Swiss bank accounts *can* be used to conceal ownership of businesses and the recipients of payments. However, the uncontradicted evidence at

86

trial was that the payment arrangements were reviewed and approved by Visci, and that ETC was approved as a recipient of payments by Visci pursuant to the anti-money laundering program that Visci administered. People in many parts of the world are far more accustomed than people in the United States to the expectation that financial transactions will be kept private and that strict confidentiality will be maintained. In context, the fact that ETC was a Panamanian business, or that it used a Swiss bank account, was not a "red flag" that bribes were being paid.

As noted above, the Trustee contends that some clearing firms (JPM and Pershing) did not wish to clear transactions that DA Partners handled for BANDES, and asserted that DA Partners made misrepresentations to Pershing and JPM about the nature of the business. That evidence fell far short of showing that DA Partners intended to hinder, delay or defraud creditors. In any event, other people (not Craig) were in charge of dealing with the clearing firms. The evidence did not show that Craig made any false statements or that he knew of any false statements. There was also insufficient evidence that Craig himself received any information about the alleged JPM and Pershing concerns that required him to investigate further, and he was aware that other reputable firms had agreed to clear the trades. There was nothing that ought to have made him question the financial condition of DA Partners, the legitimacy of the transfers it was making, or the ability of DA Partners to meet its obligations to creditors.

The SEC conducted an examination of DA Partners from November 2010 through July 2011. During that investigation the SEC asked DA Partners to explain the roles of foreign associates and foreign finders as to the transactions executed by DA Partners for customers they introduced to DA Partners. The SEC also asked for an explanation as to why the firm had stopped clearing sovereign debt fixed income transactions through JP Morgan Chase and Pershing. Visci prepared a response and circulated it to Chinea, De Meneses and others, but the draft response was

not sent to Craig.  The draft response asserted that DA Partners had ceased clearing transactions through JPM because JPM's systems and services were inferior.  It also asserted that Pershing had executed domestic equity trades and that it asked DA Partners to curtail some other business types such as sovereign debt trades, but that in 2010 Pershing agreed to clear such transactions.  The response also provided information about the payments to the foreign associates and foreign finders.  It is not quite clear from the evidence at trial just what happened with regard to the SEC investigation between March 2011 and March 2013, when (as described below) criminal charges were filed, but there is no indication that the SEC asked any follow-up questions or took any other action between March 2011 and March 2013.

The Trustee contends that the SEC's inquiry should have put Craig on notice of illegal behavior and of looming financial problems, but the evidence does not support that contention.  Visci and members of the GMG group provided the SEC with answers in early 2011; Craig did not.  The testimony shows that Craig was mostly absent from the office during this period due to a family illness.  Furthermore, the SEC asked no follow-up questions, expressed no further concerns at that time, and took no action at that time.  In effect, the Trustee suggests that Craig ought to have suspected wrongdoing based on the SEC questions, even though the SEC itself expressed no such view in 2011.

The Trustee contends that Craig was an insider and was close to Chinea, implying that Chinea must have shared what he knew and was unlikely to keep information from Craig.  The evidence did show that the two men knew each other well.  However, the Trustee has stipulated that Chinea did not know of the bribery scheme until July 2011.  Certainly, Chinea could not have shared "knowledge" of a bribery scheme before Chinea himself had such knowledge.  Furthermore, while the evidence at trial shows that Chinea communicated with GMG members by

email with respect to the bribery scheme, the BANDES business, and related matters, those emails were not sent to Craig. There was no evidence that Chinea actually shared any information with Craig about the alleged bribery scheme. The evidence shows, instead, that Chinea kept the information to himself, and did not share it with Craig.

With respect to some payments (bonuses, for example), the Trustee contended that payments were out of the ordinary course of business. But that cannot be said for salary payments. Furthermore, payments of bonuses, or profit distributions, occur frequently when businesses do well. They may constitute evidence of bad faith if they are combined with circumstances indicating that the business cannot afford to pay them, but that did not happen here.

The Trustee pointed out that Craig was aware that certain payments that the GMG had earned were made to an entity named "Forthco." But so what? The members of the GMG group apparently asked for the payments to be made in that way. Here, as in so many ways at trial, the Trustee seems to suggest that if Craig was aware of any of the money flows, that somehow was evidence that he knew or should have known the scope of the entire illegal bribery scheme, as well as the potential ultimate financial consequences (to DA Partners) of that scheme. A fair view of the evidence just does not support that contention.

Finally, Chinea sent an email that listed various "topics of concern" and requested personal email addresses of the recipients. Craig was one of the recipients of this email. No evidence was offered that any "topics of concern" included impending financial distress, or schemes to defraud creditors, or any item that might have supported a legitimate claim that Craig lacked good faith when he accepted his salary payments. The email was simply one more in an endless series of evidentiary offerings that, in the Trustee's view, a highly suspicious person *could* have regarded with a skeptical eye, but that in fact were not things that to a reasonable person ought to have

suggested that a scheme was underway to hinder, delay or defraud creditors, or that creditors were likely to be harmed or to have any problems obtaining payments of the amounts owed to them.

### C.    Craig Is Not Barred from Asserting "Good Faith" Under the New York DCL as to His Receipt of Salary Payments

The Trustee argues that Craig is barred from asserting a "good faith" defense under the New York DCL, on the theory that an insider's receipt of a payment (even on an antecedent debt) is never made in "good faith."  In this regard the Trustee relies on *Southern Indus. v. Jeremias*, 66 A.D.2d 178, 411 N.Y.S.2d 945 (2d Dep't 1978), and on later federal decisions that have interpreted the *Southern Industries* holding.

In *Southern Industries*, the court that held that a director's receipt of payment on a debt was not in "good faith" where the director knew that the payment was being made to allow the director to receive a recovery that was better than other creditors would receive.  *Id.* at 949.  Read properly, this decision is no more than a statement that an insider lacks good faith if the insider knowingly takes a preferential payment from a company.  As the court explained in *Southern Industries*, it is an abuse of an insider's control of a company's affairs for the insider knowingly to take a preference over other creditors, and under New York law such a knowing preference precludes a finding of good faith.  *Id.*

There is no basis for the application of this particular rule in this case.  There is no indication that Craig knew, believed, suspected or even should have suspected that DA Partners was insolvent or that any of the salary payments made to him was "preferential" in any way.

The Trustee nevertheless contends that as a matter of New York State law an insider is precluded from asserting a "good faith" defense as a matter of law if a transfer is made to the insider while the transferor is insolvent, regardless of what the insider knew or believed as to the transferor's financial condition and regardless of whether a preference was intended.  It is true that

some federal court decisions have described the New York rule in just such broad terms.  *See, e.g.,*

*Allen Morris Comm. Real Estate Servs. Co. v. Numismatic Collectors Guild, Inc.*, No. 90 Civ. 264,

1993 U.S. Dist. LEXIS 7052, at *26-29 (S.D.N.Y. May 27, 1993); *Hirsch v. Gersten (In re*

*Centennial Textiles)*, 220 B.R. 165, 172 (Bankr. S.D.N.Y. 1998).  The *Southern Industries* decision

is most often cited as the source of this rule, though one cannot help but wonder why.  The court

in *Southern Industries* merely held that an insider's knowing desire to prefer himself over other

creditors was inconsistent with good faith.  The court did not hold that a payment to an insider was

*automatically* made without good faith, without regard to what the insider actually knew and/or

reasonably believed about the transferor's financial condition at the time and without regard to

whether the insider did or did not act with an intent to confer a preference.

     So far as we have been able to determine, the more absolute version of the New York rule

that appears in the later federal court decisions seems to have evolved without even any discussion

of the difference between an insider's *knowing* receipt of a preference and an insider's receipt of

a payment that the insider reasonably believes to be entirely proper.  But there is a huge difference

between those two cases.  A director or other insider is not supposed to use his or her corporate

control to his or her own benefit.  While a creditor ordinarily may knowingly receive a preference

without negating the creditor's good faith, *In re Sharp Int'l. Corp.*, 403 F.3d 43, 55-56 (2d Cir.

2005), an insider who does so, and who abuses corporate powers to convey such a preference upon

himself or herself, has not acted in good faith.  But it is difficult to understand why an insider's

"good faith" should be automatically negated if a "preference" has resulted without any similar

knowledge or intent.  Under New York law a transferee normally lacks "good faith" if the

transferee (i) lacked an honest belief in the propriety of the activities in question; (ii) intended to

take unconscionable advantage of others; or (iii) intended to hinder, delay, or defraud others (or

knew that the activities in question would do so).  *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, No. 13-6437, 2016 WL 4290525, at *4 (S.D.N.Y. Aug. 11, 2016).   An insider who intentionally takes a preference may thereby "intend[] to take unconscionable advantage of others," but if such "intent" is lacking it is difficult to see why a "good faith" defense would be automatically and inflexibly barred.

It is not necessary to resolve this issue in the abstract, however, because the New York courts have not applied a "per se" rule in cases when salary payments have been challenged.  At least one New York court has held that "[w]hile transfers from the debtor to insiders to repay loans made by the insiders are deemed to be fraudulent conveyances, transfers for salaries in return for work are not."  *Matter of Northwest 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson, Inc.*, No. 150344/13, 2013 N.Y. Misc. LEXIS 3361, at *16 (Sup. Ct. N.Y. Cty. July 25, 2013).  Instead, salary payments are presumed to have been made for fair consideration in the absence of evidence of bad faith or evidence that the payments were excessive or unreasonable or that the corporation did not receive full value in return.  *Id.*  This is the prevailing approach adopted by both the state and the federal courts.  *See Am. Federated Title Corp. v. GFI Mgmt. Servs.,* 126 F.Supp.3d 388, 407 (S.D.N.Y. 2015), *aff'd*, 716 F. App'x 23 (2d Cir. 2017) (holding that payments of management fees are not subject to a per se rule regarding good faith and upholding payments of such fees); *Staudinger+Franke GmbH v. Casey*, No. 13 Cv. 6124, 2015 U.S.Dist. LEXIS 73912, at *26-29 (S.D.N.Y. June 8, 2015) (citing *Southern Industries* but also noting that salary payments are presumed to be made for fair consideration unless plaintiffs establish that the payments were made "in bad faith or the payments were excessive in light of the Defendants' employment responsibilties"); *Pryor v. Tiffen (In re TC Liquidations LLC)*, 463 B.R. 257, 268 (Bankr. E.D.N.Y. 2011) (noting the general rule that payments of salary are presumed to have been made for fair

consideration and dismissing fraudulent conveyance claims in the absence of evidence that payments were made in bad faith or that payments were excessive in light of the defendants' employment responsibilities); *Citco Cement Corp. v. White*, 55 A.D.2d 668, 390 N.Y.S.2d 178 (2d Dep't 1976) (regular payments of salary were not fraudulent conveyances without evidence that the salary was excessive or unreasonable); *but see Remo Drug Corp. v. Sheik*, No. 89-0508, 1990 WL 82820, at *1-2 (E.D.N.Y. June 12, 1990) (holding that *Southern Industries* applies to payments of antecedent debt and other transfers, including payments of accrued salary).

Some courts have explained that salary payments are treated differently because even an "economically distressed corporation" needs its officers' services. *Matter of 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson, Inc.*, 2013 N.Y. Misc. LEXIS 3361, at *16. If officers could be denied their salaries when companies are in financial trouble, then troubled companies (including dissolving corporations) would find it hard, if not impossible, to employ people to turn the businesses around or to wind up their affairs. Other courts have found reason for a special rule for salary payments in the fact that such payments are made for value that is provided on a roughly contemporaneous basis, and not as a deliberate preference over other creditors. *See Am. Federated Title Corp. v. GFI Mgmt. Servs.,* 126 F.Supp.3d 388, 407 (S.D.N.Y. 2015), *aff'd*, 716 F. App'x 23 (2d Cir. 2017). The precise theory does not matter. There is plain merit to the notion that an insider's receipt of a normal and regularly-paid salary does not represent a use of corporate power to attain an unconscionable advantage over other creditors, unless the salary itself is out of line.

At closing argument, the Trustee's counsel acknowledged the special rule applicable to salary payments and agreed that every salary payment made is presumptively received in exchange for fair consideration, though that presumption is rebuttable if the salary payments were made in bad faith or were excessive in light of employment responsibilities. Here, the Trustee offered no

93

evidence that Craig's salary payments were made in bad faith, or that they were excessive or unreasonable, or that DA Partners failed to receive full value for the salary payments it made. Instead, the evidence was entirely to the contrary.

## IX.    De Meneses Did Not Provide Faithful Service and Salary Payments Made to Him Would Have Been Voidable if Insolvency or Unreasonably Small Capital Had Been Shown

De Meneses knowingly participated in the bribery scheme starting at least as early as July 2009. His services contributed to the ultimate destruction of DA Partners. Given his admittedly criminal conduct it can hardly be said that he provided full and fair value for the payments that were made to him. *See Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 112-13 (Bankr. S.D.N.Y. 2011) ("[E]ven if the Defendants' wages were proportionate to the wages of senior management in legitimate enterprises . . . the Defendants returned less than reasonable equivalent value to BLMIS as a result of their alleged lack of faithful service."), cited by *Carney v. Lopez*, 933 F. Supp. 2d 365, 382 (D. Conn. 2013) ("Furthermore, the complaint alleges millions of dollars of transfers to defendants in exchange for failed services and breaches of fiduciary duties, a de facto overpayment."); *see also Halperin v. Moreno (In re Green Field Energy Servs., Inc.)*, No. 13-12783, 2015 WL 5146161, at *14 (Bankr. D. Del. Aug. 31, 2015) (citing BLMIS and, at pleading stage, inferring lack of fair consideration for compensation where plaintiff also alleged that transferee breached fiduciary duty and corporate waste).

However, the Trustee did not seek to recover payments from De Meneses based on breach of contract, unjust enrichment or similar theories. Nor did the Trustee seek recovery of GMG profit sharing payments on the theory that they had not really been earned as a contractual matter. The only claims made against De Meneses were fraudulent transfer claims. Regardless of whether De Meneses was a faithful employee, the Trustee can only recover transfers to De Meneses if the

Trustee proves that the transfers were made with the requisite bad intent or that they were constructively fraudulent because they were made at a time when DA Partners was insolvent or had unreasonably small capital.  The Trustee has failed to do so.

## X. The Criminal Forfeiture Judgment Does Not Bar the Trustee's Claims Against De Meneses

De Meneses has argued that he is immune from liability in this case because, when he was sentenced in the criminal case against him, he agreed to forfeit the transfers he received.  It is not at all clear, as noted above, that the amounts that De Meneses agreed to forfeit were the same as the transfers that the Trustee seeks to avoid in this case.  No evidence was offered as to how the amounts of the forfeiture judgment were calculated.  But it is not necessary to resolve this question. The Trustee argues, and the Court agrees, that the forfeiture would not have immunized De Meneses from liability in this case even if the forfeiture judgment had been calculated by reference to the same transfers.

The Bankruptcy Code provides that to the extent a transfer is avoided under sections 544 or 548, the Trustee has the right to recover not just "the property transferred" but also, in the alternative, "if the court so orders, the value of such property."  11 U.S.C. 550(a).  It does not matter, for purposes of De Meneses' liability under Section 550(a), whether or not De Meneses still has the precise funds that were fraudulently transferred to him by DA Partners.  The Trustee seeks a money judgment, and section 550 would have permitted one if the other elements of the Trustee's claims had been established.

There is nothing in the Bankruptcy Code, or in the relevant forfeiture statutes, that provides that a forfeiture is a defense or an offset to a fraudulent transfer claim.  If a fraudulent transfer had occurred, the Trustee would have had the right to recover under section 550 that would have been independent of any rights that the Trustee did or did not have to share in forfeited funds under

criminal statutes.  Perhaps De Meneses could have asked for a credit if some part of the forfeited sums had actually been paid to the Trustee, but he acknowledges that was not the case.

The forfeiture statute (21 U.S.C. § 853) says nothing about the liability to which a criminal defendant may or may not be subject pursuant to non-criminal law.  Rather, 21 U.S.C. § 853(n), entitled "Third party interests," merely states that if a party claims a superior stake in particular property, such as to avoid its forfeiture to the government, that party's only chance to assert its interest in the particular property is in an ancillary proceeding under section 853(n) of title 21. 21 U.S.C. § 853(n).  The Trustee acknowledges that he did not commence such an ancillary proceeding, but that does not matter, because the Trustee's claims in this case are not based on the notion that the Trustee still had an ownership interest in the property that De Meneses was being asked to forfeit.

When a Trustee pursues a fraudulent transfer claim the Trustee seeks to recover property (or the value of property) that once belonged to an estate but that was previously transferred. The prior transfer deprived the estate of its ownership interest in the transferred property, and that interest is not restored unless and until the Trustee succeeds in avoiding the transfer and recovering the property.  *See Fed. Deposit Ins. Corp. v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131 (2d Cir. 1992); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 229 (S.D.N.Y. 2014) (holding that transferred property is not property of a debtor, even if the debtor is seeking to recover the transferred property on fraudulent transfer grounds); *Sec. Inv'r Prot. Corp. v. Madoff*, 490 B.R. 59, 68 (S.D.N.Y. 2013); 11 U.S.C. § 541 (a)(3) (property of the estate includes property that a trustee "recovers" under section 550).  As the Second Circuit Court of Appeals held in *Hirsch*:

> If property that has been fraudulently transferred is included in the §541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless

96

> with respect to property recovered pursuant to fraudulent transfer actions . . .
> the inclusion of property recovered by the trustee pursuant to his avoidance
> powers in a separate definitional subparagraph clearly reflects the
> congressional intent that such property is not to be considered property of the
> estate until it is recovered.

980 F.2d at 131 (internal quotation marks and citations omitted); *see also Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 207 n.7 (2d. Cir. 2014) (holding that the decision in *Hirsch* forecloses any contention that a debtor retains property rights in property that has been transferred, and that fraudulently conveyed property may not be considered to be property of the estate unless and until it is recovered); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 480 B.R. 179, 192 (S.D.N.Y. 2012) (holding that previously transferred property is not property of a debtor's estate); *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005) (same); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 192 B.R. 73, 77 (S.D.N.Y. 1996) (explaining that accounts receivable transferred to and allegedly converted by defendant before the bankruptcy were "not to be considered property of the estate").

Section 853(n) of title 21 might foreclose a contention that the Trustee actually owned the forfeited property at the time the forfeiture order was entered against De Meneses, but that is not the basis on which the Trustee is proceeding here. The Trustee did not have had a property right in the forfeited property at the time of the forfeiture, because the property had been transferred. The Trustee merely had a claim to challenge the validity of the transfers and to recover either the property or its value if it proved its claims. In *DSI Assocs. LLC v. United States*, 496 F.3d 175, 184 (2d Cir. 2007) – one of the cases cited by De Meneses – the Second Circuit Court of Appeals confirmed that a person who does not claim a legal title or interest is not subject to section 853(n):

> As a general creditor of Kings Holdings and Gordon, DSI does not possess a
> "legal right, title, or interest in the property" that was forfeited as required for

> standing under section 853(n)(6)(A), nor can it show that it was a bona fide
> purchaser for value of any such right, title or interest, as required for standing
> under section 853(b)(6)(B). . . . Without possessing such an interest "in" a
> "particular, specific asset" that is, or is part of, the forfeited property, DSI does
> not meet the statutory requirements for initiating an ancillary proceeding under
> section 853(n).

The Trustee may not have held a property right that entitled it to make a claim under section 853(n), but that does not bar a claim by the Trustee to recover the "value" of the prior transfers on the ground that the transfers were fraudulent and should be avoided.

De Meneses' restitution-based argument similarly fails. De Meneses asserts that under the *in pari delicto* doctrine, the Trustee could not obtain restitution for DA Partners as a purported victim of De Meneses' crime except upon a showing that DA Partners was not involved in the criminal wrongdoing. However, the Trustee does not stand in the shoes of DA Partners when the Trustee makes claims under sections 544, 548, or 550 of the Bankruptcy Code. Those sections permit the Trustee to pursue claims for the protection of creditors and to assert rights that innocent creditors could assert.

## XI.    Craig Is Not Entitled to Indemnification for His Legal Expenses

Craig seeks indemnification for certain legal fees he incurred during the investigations of DA Partners and other individuals by the SEC and criminal authorities. He bases this counterclaim on DA Partners' Operating Agreement, which provides:

> 5:04: managers shall be indemnified by the Company (DA Partners) for "any
> *claim, demand, liability, action or damage* suffered by them on account of any
> act performed or omitted to be performed by the Manager(s) within the scope
> of the authority conferred by this Agreement and made or omitted to be made
> in good faith or based on the opinion of counsel, as well as for all costs incurred
> in the investigation or defense thereof, including attorneys' fees. However,
> any indemnity under this Section shall be paid out of and to the extent of
> company assets adverse to the Manager [sic] if the acts of the Manager(s) were
> committed in bad faith or the acts of the Manager(s) were the result of active
> and deliberate dishonesty, and, in either case, were material to the cause of

> action so adjudicated or that they personally gained in fact a financial profit or
> other advantage to which they were not legally entitled.

(Emphasis added.)   Here, however, Craig himself was not subjected to any "claim, demand, liability, action or damage."   No charges were filed against Craig by the SEC or by anyone else. Craig incurred expenses in responding to inquiries, but the expenses were not incurred in connection with "claims, demands, liabilities, actions or damages" against Craig.

Craig argues that Chinea committed acts that gave rise to claims against him and that section 5.04 should be interpreted as providing indemnification for one Manager (Craig) if claims are made against another Manager (Chinea).   However, to the extent that Chinea is to be considered the "Manager" whose "acts" gave rise to a claim or liability under the first sentence of section 5.04, those "acts" plainly were in "bad faith" and the "result of active and deliberate dishonesty." As a result, "any" indemnity would be barred under the second sentence of section 5.04.

It is true that Craig is a defendant in this adversary proceeding.   The Court was not certain whether Craig intended to argue that the indemnity applied to his defense costs in this proceeding. During closing arguments, the Court invited Craig's counsel to submit authorities if Craig wished to argue that the indemnification in the Operating Agreement is available for costs incurred by an officer in defending a fraudulent transfer claim by a bankruptcy trustee.   However, Craig did not submit such authorities, and did not pursue such a contention.

## **CONCLUSION**

For the foregoing reasons, judgment will be entered dismissing all of the Trustee's claims against Craig and De Meneses, and dismissing Craig's counterclaim.

Dated: New York, New York
     May 30, 2019

                                       **s/Michael E. Wiles**
                                       Honorable Michael E. Wiles
                                       United States Bankruptcy Judge

**Exhibit A**

**Comparison of Ryniker's and Costich's Proposed Accruals
of Liabilities Owed to Foreign Finders and Foreign Associates**

Sources: Plaintiff's exhibits 11 (Ryniker) and 16 (Costich)

| Year | Month | ETC | | Paybon | | Iuri | | Hurtado | |
|---|---|---|---|---|---|---|---|---|---|
| | | Ryniker | Costich | Ryniker | Costich | Ryniker | Costich | Ryniker | Costich |
| 2008 | Dec | | | | | | | | |
| 2009 | Jan | | | $13,448 | | | | | |
| | Feb | | | $26,454 | | | | | |
| | Mar | | | $229,551 | | | | | |
| | Apr | | | $266,951 | | | | | |
| | May | $1,376,888 | $1,376,888 | $1,794,945 | $1,794,945 | | | | |
| | June | $4,072,237 | $4,072,237 | | | | | | |
| | July | $2,775,220 | $2,775,220 | $2,782,947 | $2,782,948 | | | | |
| | Aug | $116,037 | $116,037 | | $1 | | | $1,846,754 | $1,846,754 |
| | Sept | $177,855 | $177,855 | | $1 | | | $2,348,811 | $2,348,811 |
| | Oct | $1,004,472 | $1,004,473 | | $1 | | | $3,419,823 | $3,319,823 |
| | Nov | $1,780,060 | $1,780,061 | | $1 | | | $3,847,503 | $3,647,503 |
| | Dec | $3,600 | ($51,287) | | $1 | | | $2 | $22,761 |
| 2010 | Jan | ($600) | $3,003 | | $1 | | | ($124,869) | ($112,924) |
| | Feb | | $3,003 | | $1 | $575,118 | $575,116 | | $886,354 |
| | Mar | | $3,003 | | $1 | $5,400,760 | $5,400,758 | $1,623,889 | $1,426,905 |
| | Apr | | $3,003 | | $1 | $4,790,640 | $5,990,638 | $1,506,636 | $1,298,838 |
| | May | | $3,003 | | $1 | $4,132,637 | $5,082,515 | $1,590,883 | $1,372,271 |
| | June | | $3,003 | | $1 | $2,079,864 | $3,029,742 | $1,473,037 | $1,243,611 |
| | July | | $3,003 | | $1 | $2,094,114 | $3,043,992 | $1,364,691 | $1,124,450 |
| | Aug | | $3,003 | | $1 | $2,132,103 | $3,081,981 | $1,267,714 | $1,016,660 |
| | Sept | | $3,003 | | $1 | $1,897,778 | $2,147,656 | $1,160,268 | $898,399 |
| | Oct | | $3,003 | | $1 | $1,897,778 | $1,647,656 | $1,049,017 | $776,335 |
| | Nov | | $3,003 | | $1 | $2,052,325 | $1,802,204 | $1,054,623 | $771,126 |
| | Dec | | $3,003 | | $1 | $2,052,325 | $1,802,204 | $913,069 | $748,527 |
| 2011 | Jan | | $3,003 | | $1 | $2,052,325 | $1,802,204 | $913,069 | $737,327 |
| | Feb | | $3,003 | | $1 | $2,052,325 | $1,802,204 | $913,069 | $726,127 |
| | Mar | | $3,003 | | $1 | $2,052,325 | $1,802,204 | $913,069 | $714,927 |
| | Apr | | $3,003 | | $1 | $2,052,325 | $1,802,204 | $913,069 | $703,727 |
| | May | | $3,003 | | $1 | $2,052,325 | $1,802,204 | $913,069 | $692,527 |
| | June | | $3,003 | | $1 | $2,052,325 | $1,802,204 | $913,069 | $681,327 |
| | July | | $3,003 | | $1 | $2,052,325 | $1,802,204 | $913,069 | $670,127 |
| | Aug | | $3,003 | | $1 | $2,052,325 | $1,802,204 | $773,656 | $658,927 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Sept | $3,003 | | $1 | $2,002,325 | $1,802,204 | $634,243 | $630,927 |
| | Oct | $3,003 | | $1 | $1,952,325 | $1,802,204 | $494,831 | $602,927 |
| | Nov | $3,003 | | $1 | $1,902,325 | $1,802,204 | $355,418 | $574,927 |
| | Dec | $3,003 | | $1 | $1,110,648 | $1,060,527 | $216,005 | $546,927 |
| 2012 | Jan | $3,003 | | $1 | $1,060,648 | $1,060,527 | $216,005 | $518,927 |
| | Feb | $3,003 | | $1 | $1,010,648 | $1,060,527 | $216,005 | $490,927 |
| | Mar | $3,003 | | $1 | $734,948 | $784,827 | $216,005 | $462,927 |
| | Apr | $3,003 | | $1 | $634,948 | $784,827 | $216,005 | $434,927 |
| | May | $3,003 | | $1 | $584,948 | $784,827 | $216,005 | $406,927 |
| | June | $3,003 | | $1 | $534,948 | $784,827 | $216,005 | $378,927 |
| | July | $3,003 | | $1 | $490,948 | $784,827 | $216,005 | $350,927 |
| | Aug | $3,003 | | $1 | $490,948 | $784,827 | $216,005 | $322,927 |
| | Sept | $3,003 | | $1 | $480,948 | $784,827 | $216,005 | $294,927 |
| | Oct | $3,003 | | $1 | $480,948 | $784,827 | $216,005 | $266,927 |
| | Nov | $3,003 | | $1 | $480,948 | $784,827 | $216,005 | $238,927 |
| | Dec | $3,003 | | $1 | $480,948 | $784,827 | $216,005 | $210,927 |

## Exhibit B

### Comparison of Ryniker's and Costich's
### Proposed Accruals of Liabilities Owed to GMG

Sources:  Plaintiff's exhibits 11 (Ryniker) and 16 (Costich)

| Year | Month | GMG | |
| --- | --- | --- | --- |
| | | Ryniker | Costich |
| 2008 | Dec | $203,966 | |
| 2009 | Jan | $203,965 | |
| | Feb | | |
| | Mar | | |
| | Apr | $527,509 | |
| | May | $2,492,662 | $2,492,662 |
| | June | $4,524,330 | $4,524,330 |
| | July | $6,325,201 | $6,325,201 |
| | Aug | $8,461,945 | $8,461,945 |
| | Sept | $9,131,276 | $9,131,276 |
| | Oct | $10,305,198 | $10,305,198 |
| | Nov | $10,967,477 | $10,967,477 |
| | Dec | $9,358,657 | $9,358,657 |
| 2010 | Jan | $9,364,833 | $9,363,879 |
| | Feb | $5,272,151 | $7,913,104 |
| | Mar | $6,083,186 | $8,722,245 |
| | Apr | $4,285,246 | $4,279,116 |
| | May | $4,611,299 | $4,601,346 |
| | June | $4,522,305 | $4,511,593 |
| | July | $4,483,004 | $4,472,000 |
| | Aug | $4,427,340 | $4,412,632 |
| | Sept | $4,450,030 | $4,433,050 |
| | Oct | $4,410,271 | $4,395,993 |
| | Nov | $4,566,480 | $4,529,262 |
| | Dec | $4,567,897 | $4,514,344 |
| 2011 | Jan | $4,567,897 | $4,514,344 |
| | Feb | $4,567,897 | $4,514,344 |
| | Mar | $4,567,897 | $4,514,344 |
| | Apr | $4,567,897 | $4,514,344 |
| | May | $4,567,897 | $4,514,344 |
| | June | $4,567,897 | $4,514,344 |
| | July | $4,367,897 | $4,514,344 |
| | Aug | $4,367,897 | $4,514,344 |

|      |       |             |             |
|------|-------|-------------|-------------|
|      | Sept  | $4,267,897  | $4,514,344  |
|      | Oct   | $4,217,897  | $4,514,344  |
|      | Nov   | $4,217,897  | $4,514,344  |
|      | Dec   | $4,067,897  | $4,514,344  |
| 2012 | Jan   | $4,017,897  | $4,514,344  |
|      | Feb   | $3,967,897  | $4,514,344  |
|      | Mar   | $3,967,897  | $4,514,344  |
|      | Apr   | $3,892,897  | $4,514,344  |
|      | May   | $3,867,988  | $4,514,344  |
|      | June  | $3,842,897  | $4,514,344  |
|      | July  | $3,817,897  | $4,514,344  |
|      | Aug   | $3,792,897  | $4,514,344  |
|      | Sept  | $3,792,897  | $4,514,344  |
|      | Oct   | $3,792,897  | $4,514,344  |
|      | Nov   | $3,792,897  | $4,514,344  |
|      | Dec   | $3,792,897  | $4,514,344  |